**ASSOCIATION FOR RETARDED CITIZENS OF NORTH DAKOTA, et al., Plaintiffs,**

v.

**George A. SINNER, et al., Defendants.**

**Civ. No. A1–80–141.**

United States District Court, D. North Dakota, Southwestern Division.

Feb. 6, 1987.

Michael J. Williams, Moorhead, Minn., Mary Deutsch Schneider, Legal Assistance of North Dakota, Fargo, N.D., for plaintiffs.

Nicholas J. Spaeth, Atty. Gen., N.D., Lynn Jordheim, Asst. Atty. Gen., Bismarck, N.D., for defendants.

## MEMORANDUM AND ORDER

VAN SICKLE, District Judge.

On October 2, 1986, the Monitor issued notice to the Court and the State of North Dakota that the State had not complied with the Court's March 7, 1984 implementation order with respect to providing services to Christopher Mullins (Christopher). The State's regional developmental disabilities screening team concluded that Christopher is not developmentally disabled. Christopher is a nine-year old boy with normal intelligence who suffers from Tourette's syndrome, attention deficient disorder, and behavior disorder. An expert retained by the Monitor concluded that Christopher is developmentally disabled under the State's criteria. Therefore, the Monitor concluded that Christopher is entitled to class member status, and that the State had not complied with the implementation order in Christopher's case, and issued notice of noncompliance, pursuant to paragraph 142 of the order of March 7, 1984 (the implementation order).

Pursuant to paragraph 143, the parties undertook to resolve the matter informally. They were unable to do so, and on November 7, 1986, the Monitor met with the State and the Association for Retarded Citizens of North Dakota (ARC) in a formal conference.

By letter dated November 24, 1986, the Monitor referred the matter to the Court for resolution. *See* paragraph 144. In the letter of reference, the Monitor stated his conclusion that Christopher is developmentally disabled and is a class member who has been denied services to which he is entitled under the implementation order.

Pursuant to paragraph 145 of the implementation order, the defendants contested the Monitor's report, so the matter was presented to this Court on January 30, 1987.

The position of the Plaintiffs is that Christopher is developmentally disabled, and that fact alone qualifies him as a member of the plaintiff class. Further, that Christopher has been denied the services and care which must be provided to members of the plaintiff class. That denial included the failure to place Christopher in community service programs (paragraph

93), and the failure to protect Christopher from abuse and neglect by those entrusted with his care, as shown by their refusal to provide the Monitor with investigative reports of his abuse (paragraph 51), and finally a failure to provide meaningful case management for Christopher's problems, as required by paragraph 131.

The position of the defendants is that in order for Christopher to be protected as a member of the plaintiff class, he must be both developmentally disabled and mentally retarded. Further, the defendants claim that in his case, management as required under the implementation order, is either unnecessary or is furnished by other means, and that the Department of Human Services has taken other steps to protect Christopher from the abuses to which he has been subjected.[1]

Finally, the defendants claim that they are providing Christopher with adequate care and assistance by placing him in a residential educational program in Bemidji, Minnesota, and have assigned him an educational case manager from the Grand Forks Special Education Program.

Thus, what began as the Monitor's concern for an abused, developmentally disabled child, has become a question of:

a. Does the plaintiff class include all developmentally disabled persons, whether or not mentally retarded, and

b. If not, should the class be redefined to include those persons?

After a consideration of all of the evidence, this Court adopts the decision of the Monitor as to Christopher's being developmentally disabled, and finds:

1. That Christopher is mentally ill as the phrase is used in N.D.C.C. 25–03.-1–02(10).

2. That Christopher is developmentally disabled as the phrase is used in 42 U.S.C. § 6001 and in N.D.C.C. 25–01.-2–01.

3. That Christopher is not mentally retarded as the term is used by psychologists to refer to persons whose impairments include mental development measured on an I.Q. scale at about 70, plus other relevant factors.

The evidence as to his mental illness included evidence of extreme hyperactivity, and bizarre behavior associated with Tourette's Syndrome. The evidence as to the developmental disability showed that his adjustment to social situations, self-care and self-control were substantially below that of his peers. The evidence as to mental retardation showed that his I.Q. was high average—so high as to override any conclusion that his inability to measure up to the normal conduct of his peers was due to mental retardation.

The Human Services Department of North Dakota has concluded that even though he may be developmentally disabled, since he is not mentally retarded, he need not receive the programs and services which must be provided to the members of the plaintiff class in the principal case; and that alternative programs provided to him, and financed at least in part under the Education for All Handicapped Children Act,[2] and other health education or welfare programs, are adequate to meet his needs.

It seems well established that approximately 3% of the general population is mentally retarded. Of that 3%, about two-thirds, or 2% of the general population, after they finish formal schooling, mold into that population and are of little or no further concern to the social service groups. Of the remaining 1%, most (probably about seven-eighths of the 1%) are, in part because of their severe retardation, and usually because of physical deformities and handicaps, also developmentally disabled. And in the nature of the problem, their developmental disabilities begin early

1. While a patient at the State Hospital for the mentally ill, Christopher was purportedly subjected to an act or acts of sodomy by another patient.

2. 20 U.S.C.A. § 1232, 1401, 1405, 1406, 1411–1420, 1453 (West.Supp.1986).

in life and are long term, and usually permanent.

National concern for the problems of the developmentally disabled was highlighted by the expansion on March 28, 1974 of the "President's Committee on Mental Retardation," which was established on May 11, 1966.[3]

The original statutory scheme for assistance to the developmentally disabled was passed in 1975. In that statute the term "developmental disability" was defined as being limited to conditions "attributable to mental retardation, cerebral palsy, epilepsy, or autism."[4] In 1978, Congress redrafted the definition of developmentally disabled, abandoning the diagnostic approach it had used in the first definition (mental retardation, autism, epilepsy, and so forth), and utilizing a functional approach (mental or physical impairment, manifested before the age of 22, continue indefinitely, need for lifelong or extended care, and so forth). And the intent and purpose of this redrafted definition was to provide the planning and services (developmental model) to "all disability groups covered by the functional definition."[5]

This functional definition as placed in the statute in 1978, continued through all subsequent amendments to this date, reads:

The term "developmental disability" means a severe, chronic disability of a person which—

(A) is attributable to a mental or physical impairment or combination of mental and physical impairments;

(B) is manifested before the person attains the age of twenty-two;

(C) is likely to continue indefinitely;

(D) results in substantial functional limitations in three or more of the following areas of major life activity: (i) self-care, (ii) receptive and expressive language, (iii) learning, (iv) mobility, (v) self-direction, (vi) capacity for independent living, (vii) economic self-sufficiency; and

(E) reflects the person's need for a combination and sequence of special, interdisciplinary, or generic care, treatment, or other services which are of lifelong or extended duration and are individually planned and coordinated.[6]

The North Dakota statutory framework for the care of the developmentally disabled, passed in 1981, which defines developmental disability is identical to the federal statute except that the format is improved and in place of the phrase "economic self-sufficiency," the North Dakota Statute uses the phrase "economic sufficiency."[7 & 8]

So I conclude that the two statutes have identical meanings.

■ And it follows that since Christopher is a developmentally disabled person, he qualifies for the services and techniques which are embodied in the "developmental model" of assistance, as that developmental model has evolved, and as it is outlined in 42 U.S.C.A. § 6001 (West Supp 1986).

---

3. *See* Exec. Order No. 11,776, 39 Fed.Reg. 11,865 (1974), *reprinted in* 42 U.S.C. Chapter 75 at 1936–37 (1976).

4. Pub.L. No. 94–103, 89 Stat. 495 (1975) (codified as amended at 42 U.S.C.A. §§ 6000–6081 (West.Supp.1986)).

5. H.Conf.Rep. No. 1780, 95th Cong., 2d Sess. 105 *reprinted in* 1978 U.S.Code Cong. & Ad.News 7312, 7416. And *see Lynch v. Maher,* 507 F.Supp. 1268 (D.Conn.1981).

6. 42 U.S.C.A. § 6001(7) (West Supp.1986).

7. N.D.C.C. 25–01.2–01(1) which is copied verbatim into the implementation order at paragraph 14.

8. At their best, statutory programs for the developmentally disabled, or in the field of social service, are often vague and prolix. An English writer said the American public health scheme is "a shambles of pedantry and expedience." *The Moronic Inferno and Other Visits to America,* Martin Amis.

Justice Blackmun was more succinct. He referred to the Developmental Disabilities Assistance and Bill of Rights Act as "this confused and confusing legislation." *Pennhurst State School & Hospital v. Halderman,* 451 U.S. 1, 32, 101 S.Ct. 1531, 1547, 67 L.Ed.2d 694 (1981) Blackmun, J., concurring).

But there are further questions: Is Christopher a member of the plaintiff class and therefore sheltered by the beneficial protection of the decisions and orders in this case?

I must answer, no.

The action as framed by the plaintiffs in their original pleadings, was carefully directed at the State's program for care of the mentally retarded and those persons who had other diagnostically recognized disabilities like epilepsy, autism, and dyslexia, which were normally handled by the Grafton Complex.

Thus, the original definition of the plaintiffs' class was restricted, with the assistance of plaintiffs' counsel, to exclude those persons loosely identified as mentally ill, and under the State's administrative program, cared for through the Jamestown Hospital for the mentally ill and its complex of buildings and services.

This conclusion raises a further question: Shall the class be redefined to include those developmentally disabled persons who are also mentally ill? This Court is not willing so to do. First, because as pointed out at the commencement of this action, the plaintiffs deliberately omitted the mentally ill from the class, apparently reasoning that the problems at Grafton were a big enough bite to take on at one time. Second, because there was no showing that the residential educational program, and the case management service presently provided to Christopher do not meet the necessary elements of a developmental model for his proper assistance. Third, because redefinition of the class would impose on the litigants and the Court a complete restructuring of the procedures required by Fed.R.Civ.P. 23, and the order determining the class. If court intervention is necessary to assure that Christopher's constitutionally protected rights are afforded him, a separate action would be far more efficient, and less burdensome to administer.

9. *Jackson v. Bishop,* 404 F.2d 571, 580 (8th Cir. 1968).

One other matter merits a short discussion: This Court heard some evidence as to cost. But it was at the very best inconclusive.

In any event: It is well established, and in fact, any reflective thinker must recognize, that no governing body, city, state, or federal, can excuse its denial of constitutionally protected rights because of the cost of recognizing those rights. Any other principle would give to the governing bodies the power to destroy individual constitutional rights at will. This principle has been repeatedly stated by the courts. It was stated by Justice Blackmun, then United States Circuit Judge for the Eighth Circuit, in a prisoner cruelty case in this language:

... constitutional requirements are not, in this day, to be measured or limited by dollar considerations ....[9]

IT IS ORDERED:

1. The motion to include Christopher in the plaintiffs class is *denied.*

2. The motion to amend the definition of the class is *denied.*