Christopher MULLINS, Appellee,

v.

**NORTH DAKOTA DEPARTMENT OF HUMAN SERVICES, Appellant.**

Civ. No. 910077.

Supreme Court of North Dakota.

March 19, 1992.

Sidney J. Hertz Fiergola (argued), Asst. Atty. Gen., Bismarck, for appellant.

Gerry Gunderson (argued), of Wheeler Wolf, Bismarck, for appellee.

MESCHKE, Justice.

The North Dakota Department of Human Services appeals an order of the district court directing the Department to find Christopher Mullins "eligible for all developmental disability services if it is determined that he meets the definitional criteria contained in the North Dakota Century Code, without distinguishing between the mentally retarded or mentally ill." Because the Department now concedes that Christopher is developmentally disabled, and because Christopher acknowledges that the Department presently furnishes him with all appropriate services, we affirm.

Christopher Mullins is an adolescent of normal intelligence who is chronically mentally ill. His diagnoses include Tourette's syndrome,[1] attention deficit hyperactive disorder, schizophreniform disorder in remission, and aggressive conduct disorder—undersocialized type. Christopher needs daily medication to treat his illnesses and needs special education to deal with his uncontrolled behavior. He was first hospitalized at the North Dakota State Hospital; then from 1987–1990, he was at the Archbishop Gilfillan Residential Treatment Center in Bemidji, MN; and, since 1990, he has been living in a licensed foster home at Grafton, closer to his family's home in Minto.

Years ago, those helping Christopher began to seek developmental disability services for him from the Department. In 1986, Christopher, represented by Legal Assistance of North Dakota, asked the Federal District Court for North Dakota to include Christopher in the protected class of developmentally disabled persons entitled to receive services under the implementation order in *Association for Retarded Citizens of North Dakota v. Olson*, 561 F.Supp. 473 (D.N.D.1982), *[A.R.C.]*, affirmed and remanded in part, 713 F.2d. 1384 (8th Cir. 1983). Inclusion in that protected class would have entitled Christopher to services, treatment, and habilitation, including food, clothing, shelter, medical care, and education, regardless of age or condition. 561 F.Supp. at 494.

The Federal District Court ruled that Christopher was developmentally disabled under both federal and state statutes—42 U.S.C. § 6001 and NDCC 25-01.2-01. *Association For Retarded Citizens of North Dakota v. Sinner*, 115 F.R.D. 28, 31–32 (D.N.D.1987). However, because Christopher is mentally ill, not mentally retarded, the Court ruled that he is not a member of the class protected in that implementation order. *Id.* at 32. The Court concluded that Christopher "qualifies for the services and techniques which are embodied in the 'developmental model' of assistance," but was unwilling to redefine the protected class of mentally retarded persons to include those who are mentally ill. *Id.* Another reason that the Court refused Christopher class status was that "there was no showing that the residential educational program and the case management service presently provided to Christopher do not meet the necessary elements of a developmental model for his proper assistance." *Id.*

In 1987, assisted by representatives of the Protection and Advocacy Committee,[2] Christopher renewed his application to the Department for case-management services for the developmentally disabled. The Department denied that application, relying on the criteria in the Service Chapters of its Manual for identifying mentally retarded persons protected by the *A.R.C.* class ac-

---

1. Tourette's syndrome is defined by Dorland's Illustrated Medical Dictionary (Twenty-fifth edition; 1974), p. 1520:
   A syndrome of facial and vocal tics with onset in childhood, progressing to generalized jerking movements in any part of the body, with echolalia and coprolalia; once thought to have an unfavorable prognosis but recently shown to be responsive to treatment with butyrophenones.

2. *See* NDCC Ch. 25–01.3 for the statutes authorizing activities of the committee on protection and advocacy for developmentally disabled persons.

tion decree. The Department ruled that Christopher is not mentally retarded, that he is not a member of the class protected by the *A.R.C.* decree, and that it is not necessary to determine whether Christopher is developmentally disabled. The Department reasoned that Christopher is of average intelligence, and that his disability, consisting of psychiatric disorders, is dissimilar to mental retardation.

On appeal, the district court reversed that decision by the Department, and remanded "with instructions to make a determination whether Christopher is 'developmentally disabled' as defined under the statute, and to provide the appropriate services thereunder." The Department appealed to this court.

Christopher's appeal was consolidated with the appeals of two other applicants seeking case-management services from the Developmental Disabilities Division of the Department. The other applicants, too, had been denied services by the Department's application of the Service Chapters of its Manual for identifying mentally retarded persons protected by the *A.R.C.* decree. In that appeal, this court reasoned that the Department's reliance upon the criteria in the Service Chapters of its Manual "results in the inclusion or exclusion of applicants for case management services...." We ruled that the relevant parts of the Manual had not been adopted as rules, and hence were invalid and ineffective. *Mullins v. North Dakota Department of Human Services*, 454 N.W.2d 732 (N.D.1990). Accordingly, we affirmed the district court's judgment that reversed the Department's refusal to decide whether Christopher was developmentally disabled. We remanded with directions that the De-

partment determine Christopher's eligibility for services under the relevant statute, NDCC 25–01.2–01(1), that defines "developmental disability".[3]

After remand, two multi-disciplinary meetings were conducted by the Department to evaluate Christopher's current treatment and continuing needs. Christopher's eligibility for developmental disability services was not addressed, and six months after remand, the Department had not yet acted on his eligibility. Impatient with this procrastination, counsel for Christopher moved the district court for an order directing the Department to show cause why it had not complied with the directions on remand. *See Luithle v. Burleigh County Social Service*, 474 N.W.2d 497 (N.D.1991) (The district court retains jurisdiction when an appeal of a decision by an administrative agency is remanded to the agency for reconsideration). The Department then notified Christopher's father that Christopher was not eligible for "Developmental Disabilities services" because he was not mentally retarded, and because "his needs were being met through existing behavioral interventions." Notwithstanding that determination, the court heard both sides on the show-cause question.

From testimony of Robert Sanderson, the Department's Regional Director of the Northeast Human Services Center at Grand Forks, and of Sandi Noble, Director of the Developmental Disability Division of the Department, the district court understood the Department's position to be that, because Christopher "is not mentally retarded, he is not eligible for certain services," particularly case-management services

---

**3.** The relevant statute, NDCC 25–01.2–01(1), says:

1. "Developmental disability" means a severe, chronic disability of a person which:
a. Is attributable to a mental or physical impairment or combination of mental and physical impairments;
b. Is manifested before the person attains age twenty-two;
c. Is likely to continue indefinitely;
d. Results in substantial functional limitations in three or more of the following areas of major life activity:

    (1) Self-care;
    (2) Receptive and expressive language;
    (3) Learning;
    (4) Mobility;
    (5) Self-direction;
    (6) Capacity for independent living; and
    (7) Economic sufficiency; and
e. Reflects the person's needs for a combination and sequence of special, interdisciplinary, or generic care, treatment, or other services which are of lifelong or extended duration and are individually planned and coordinated.

from its Developmental Disability Division. The court ruled that the statute did not distinguish between those who are mentally retarded and thus developmentally disabled, on the one hand, and those who are mentally ill and thus developmentally disabled, on the other hand. The court drew this conclusion from the relevant statute that says:

*All* persons with developmental disabilities have a *right* to appropriate treatment, services, and habilitation for those disabilities. Treatment, services, and habilitation for developmentally disabled persons must be provided in the least restrictive appropriate setting.

NDCC 25–01.2–02 (1991). (Emphasis supplied). The court went on to say that the Department "must realize that it has to provide services to all developmentally disabled persons, not just those who are mentally retarded" and that "if [Christopher] is developmentally disabled, then he must be provided D[evelopmental] D[isability] services, which include case management services."

The district court reasoned that the Department "may not pick and choose who gets what services; it must provide the applicants for services with objective eligibility criteria before making such a decision." Because the Department determined Christopher's eligibility for developmental disability services "without some type of objective criteria," the court concluded that it acted arbitrarily, capriciously, and unreasonably. Therefore, the court directed that the Department "find [Christopher] eligible for all developmental disability services if it is determined that he meets the definitional criteria contained in the North Dakota Century Code, without distinguishing between the mentally retarded or mentally ill."

The Department appeals, declaring:

Although the Department asserted that it did not need to determine whether Mullins was developmentally disabled because appropriate services were provided and available to him, the Department ... now concede[s] that [Christopher] is de-

velopmentally disabled in order to put all the issues before this court.

The Department then argues that the district court "abused its discretion in requiring all D[evelopmental] D[isability] services to be provided to all developmentally disabled," and that, therefore, its decision should be reversed.

Because the Department says that it is furnishing appropriate services to Christopher primarily through educational placements, the Department asserts that it is discharging its duties to him as a person with developmental disabilities. The Department argues that additional services are neither necessary nor appropriate for Christopher. According to the Department, because it "stands ready, willing, and able to provide treatment, services, or habilitation that are appropriate to meet his needs," there is nothing more that the Department can be compelled to do for Christopher. The Department declares that it "does not have a duty to provide services without regard to cost," and that it "has the authority to determine which of its divisions should serve [Christopher], and which services are most appropriate for him".

The brief for Christopher on this appeal does little to respond to the Department's arguments here. Rather, Christopher simply argues that the Department failed to comply with the prior remand of this court, postponed action unduly, and arbitrarily distinguished between a mentally retarded person and a mentally ill person in furnishing services to Christopher. Christopher asks this court to "affirm the district court's decision, and to order that Christopher is eligible for developmental disability services (including case management) based upon the admission by the Department that Christopher is developmentally disabled."

The Department outlines for us those services, (within the "developmental model", it says), that it is furnishing to Christopher. Christopher receives special education services through the Education of the Handicapped Act. *See* 20 U.S.C. § 1400 et seq. Christopher has an individ-

ualized education plan and receives special-education case-management. Christopher also receives foster care through the Department, having been transferred in 1990 from the Gilfillan Home at Bemidji, MN, to a licensed foster home in Grafton. According to the Department, this foster care furnishes Christopher access to his family on a regular basis, a form of case-management services, and appropriate services "in the least restrictive appropriate setting consistent with the developmental disability statute." [4] Additionally, the Department says that it has identified the mental health services appropriate for Christopher and his family, and has offered individual and family therapy, as well as clinical case-management, to them. Christopher does not dispute this description of services offered to him and received by him, although he persists in seeking case-management services through the Department's Developmental Disability Division.

Christopher simply argues that the Department was unjustifiably slow in designating his disability classification on remand. We agree that the Department unduly delayed and ignored Christopher's statutory eligibility for developmental disability services. Now, though, that question has been answered by the Department's concession that Christopher is developmentally disabled. Nothing more remains to be decided about Christopher's eligibility for services.

■ Instead, the Department would like to have us decide a different question about whether it is required to furnish equivalent services to all developmentally disabled persons directly through its Developmental Disabilities Division. We decline to do so. That question is beyond the scope of this appeal. Only Christopher's case, not a class action nor a declaratory judgment, is here.

The Department urges that developmental disabilities stem from a variety of conditions, not a singular diagnosis, which consequently must be addressed by a variety of treatments, not a singular program. Indeed, if we understand correctly, implicit in the concept of "case-management" is a method to identify and schedule the varied services appropriate for the individualized conditions of each developmentally disabled person. This argument, then, does little to advance the Department's position.

■ The Department argues that it is statutorily authorized to offer services to the developmentally disabled who are mentally ill through other divisions and other means than those used to serve the developmentally disabled who are mentally retarded.[5] Accordingly, the Department

---

4. NDCC 25–01.2–02 says:

   *Appropriate treatment, services, and habilitation—Treatment in least restrictive appropriate setting.* All persons with developmental disabilities have a right to appropriate treatment, services, and habilitation for those disabilities. Treatment, services, and habilitation for developmentally disabled persons must be provided in the least restrictive appropriate setting.

5. The Department cites statutes that state the scope of its powers and duties. NDCC 25–16–10 says:

   *Purchase of services.* The department of human services may purchase from funds appropriated to it for that purpose, residential care, custody, treatment, training, and education for developmentally disabled persons from any treatment or care center for such persons licensed in this state.

   NDCC 25–16–11 says:

   *Funds of state department of human services for purchasing residential care, custody, treatment, and education for developmentally disabled persons.* All moneys received from appropriation by the legislative assembly to purchase residential care, custody, treatment, training, and education for developmental disabled persons from any treatment or care centers licensed in North Dakota must be kept by the state treasurer in a fund known as the "fund of the state department of human services for purchasing residential care, custody, treatment, training, and education for developmentally disabled persons", and all expenditures made under the provisions of this chapter must be upon warrants prepared by the office of management and budget and signed by the state auditor, such expenditures to be supported by vouchers to be signed by the executive director of the state department of human services or his agents, or by such other officer or assistants as the executive director may designate and certify to the office of management and budget. Any funds received from federal agencies must be deposited and disbursed in the manner provided by act of Congress or by the regulations of the

says that it has chosen to serve the mentally retarded through its Developmental Disabilities Division, and to serve the mentally ill through its Mental Health Division.[6] Because Christopher is not mentally retarded, the Department explains that his services are not furnished through the Department's Developmental Disabilities Division, but instead are furnished in other ways. So long as there is no unreasonable discrimination in services to different categories of the developmentally disabled, this is an understandable explanation.

■ No unreasonable discrimination is presently evident here. During oral argument, counsel for Christopher acknowledged that there were no identifiable deficiencies in the services presently furnished to Christopher. This record indicates that Christopher is functioning satisfactorily both in school and in foster care. But, in the present framework of combined federal and state resources for the mentally ill, Christopher's special-education services will end, apparently, when Christopher reaches the age of twenty-one.[7] Thus,

federal agencies from which the funds were received.

NDCC 50–06–05.1 says, in part:

*Powers and duties of the department.* The department has the following powers and duties to be administered, with the advice of the board, by the department through its state office or through regional human service centers or otherwise as directed by it:

\* \* \* \* \* \*

14. To provide insofar as staff resources permit appropriate human services, including social histories, social or social-psychological evaluations, individual, group, family, and marital counseling, and related consultation, when referred by self, parent, guardian, county social service board, court, physician, or other individual or agency, and when application is made by self (if an adult or emancipated youth), parent, guardian, or agency having custody; also, on the same basis, to provide human services to children and adults in relation to their placement in or return from the developmental center at Grafton, state hospital, or North Dakota industrial school.

NDCC 50–06.2–03(3) says, in part:

*Powers and duties of the state agency.* The state agency has the following powers or duties under this chapter:

\* \* \* \* \* \*

3. To make available, through county agencies or human service centers, any or all of the services set out in the comprehensive human services plan on behalf of those individuals and families determined to be eligible for those services under criteria established by the state agency.

6. NDCC 50–06–06.5 says:

*Continuum of services for chronically mentally ill individuals.* The department of human services shall develop a plan for integrated, multidisciplinary continuum of services for chronically mentally ill individuals. The continuum may consist of an array of services provided by private mental health professionals, private agencies, county social service agencies, human service centers, community-based residential care and treatment facilities,

and private and public inpatient psychiatric hospitals. To the extent feasible, access to the continuum must be through human service centers. Within the limits of legislative appropriations, the plan for a continuum may include:

1. Programs, and appropriate related facilities, to provide socialization skills.
2. Programs, and appropriate related facilities, to provide basic living skills.
3. Appropriate residential facilities.
4. Appropriate training, placement, and support to enhance potential for employment.
5. Appropriate delivery and control of necessary medication.
6. Appropriate economic assistance.
7. An inpatient facility with appropriate programs to respond to persons who require hospitalization.

The continuum of care must provide that a person requiring treatment be submitted to the least restrictive available conditions necessary to achieve the purposes of treatment. The department shall ensure appropriate cooperation with county social service agencies and private providers in achieving the continuum of care.

7. 20 U.S.C. § 1412 says:

*Eligibility requirements*

In order to qualify for assistance under this part in any fiscal year, a State shall demonstrate to the Secretary that the following conditions are met:

\* \* \* \* \* \*

2. The State has developed a plan pursuant to section 613(b) [20 USCS § 1413(b)] in effect prior to the date of the enactment of the Education for All Handicapped Children Act of 1975 [enacted Nov. 29, 1975] and submitted not later than August 21, 1975, which will be amended so as to comply with the provisions of this paragraph. Each such amended plan shall set forth in detail the policies and procedures which the State will undertake or has undertaken in order to assure that—

\* \* \* \* \* \*

(B) a free appropriate public education will be available for all handicapped children be-

Christopher's main concern seems to be about tomorrow, not today. In effect, Christopher seeks assurances that he will receive comparable treatment and services after he becomes an adult. The Department replies that it would expect to undertake other appropriate services for Christopher, if needed, when his special-education services end.

Because Christopher does not identify any specific deficiency in his current services and treatment, he virtually concedes that he is now served appropriately. Beyond that, it is not presently possible to judicially address Christopher's anxieties. For the future, under the Act for the Developmentally Disabled, "[e]very developmentally disabled person is entitled to enforce any of the rights guaranteed by this chapter by civil action or any other remedy available by common law or statute." NDCC 25–01.2–17. In these circumstances, we conclude that Christopher's concerns are not present questions. *See In the Interest of C.W.*, 453 N.W.2d 806 (N.D.1990). Because there is no dispute ripe for legal review, we decline to address Christopher's future concerns.

The Department concedes that Christopher is developmentally disabled. For present purposes, Christopher acknowledges that he is being furnished appropriate services and treatment for his developmental disabilities. We decline to give advisory opinions on the other questions urged by the parties.

When an administrative agency decision is appealed to the district court and thereafter to this court, we review the decision of the agency. *Speedway Inc. v. Job Service North Dakota*, 454 N.W.2d 526 (N.D.1990). When we review an administrative decision, one of the requirements is that we determine whether the agency decision is in accordance with the law. NDCC 28–32–19(1). In making that determination, we look to the law and its application to the facts. *Bickler v. North Dakota State Highway Commissioner*, 423 N.W.2d 146 (N.D.1988). In this case, we conclude that the Department's decision refusing to classify Christopher as developmentally disabled was not in accordance with the law. However, because the Department now concedes that Christopher meets the statutory definition of a person developmentally disabled, and because Christopher acknowledges that the Department is presently furnishing him with all services appropriate to his disabilities, we conclude that the Department is now complying with the law as directed by the district court.

Accordingly, we affirm the district court.

ERICKSTAD, C.J., and LEVINE and VANDE WALLE, JJ., concur.

Justice H.F. GIERKE III, a member of the Court when this case was heard, resigned effective November 20, 1991, and did not participate in this decision. Justice JOHNSON not being a member of this Court at the time this case was heard did not participate in this decision.

tween the ages of three and eighteen within the State not later than September 1, 1978, and for all handicapped children between the ages of three and twenty-one within the State not later than September 1, 1980, except that, with respect to handicapped children aged three to five and aged eighteen to twenty-one,

inclusive, the requirements of this clause shall not be applied in any State if the application of such requirement would be inconsistent with State law or practice, or the order of any court, respecting public education within such age groups in the State;