DECISION
This action is an administrative appeal under G.L. 1956 (1993 Reenactment) § 42-35-15 from a decision of a hearing officer designated by the Director of the Department of Mental Health Retardation Hospitals (MHRH). The plaintiff Richard Pacheco requested an adjudicatory hearing following determinations by MHRH's Division of Developmental Disabilities (DDD) and its Division of Integrated Mental Health (DIMH) that he was ineligible for services through these respective divisions of MHRH. In a decision dated August 30, 1995, the hearing officer held that plaintiff was not eligible for services through DDD or through DIMH. The plaintiff commenced this action on September 26, 1995. The court has reviewed the record, and affirms the decision that plaintiff is not eligible for services through DDD, but remands on the issue of eligibility for services through DIMH.
Facts/Travel
Richard Pacheco at the time of his initial referral to DDD, was 20 years old and was living at The Learning Center in Waltham, Massachusetts, a residential treatment facility. Richard, a Rhode Island resident, has been living in residential treatment facilities in Rhode Island and Massachusetts since he was 9 years old on the recommendation of psychiatrists and social workers over the years. The record discloses that among other conditions, Richard has Tourette's disorder, learning disabilities, and is borderline mentally retarded. He also suffers from abnormalities which are associated with Tourette's disorder including attention-deficit-hyperactivity-disorder, obsessive-compulsive disorders, impulsive behaviors, and socially inappropriate behaviors such as profanity and suggestive gestures. The Tourette's disorder causes Richard to display repetitive involuntary tics which are both physical and vocal, such as twitching, muscle contractions and vocal noises. In addition, Richard is behaviorally maladjusted as demonstrated by incidents of stealing, assaulting others, and aggression. A recent psychiatric evaluation discloses that Richard also suffers from major depressive disorder.
Between the ages of 9 and 21 years, Richard qualified for services, including education and treatment, through funding provided by the Rhode Island Department of Children, Youth and Their Families (DCYF) pursuant to G.L. 40.1-7-1 et seq. entitled "Services for Emotionally Disturbed Children." The funding stream under this chapter is known as "MHSCY" (pronounced "missy.") Such funding would not be available to Richard after his twenty-first birthday on August 24, 1995. Similarly, upon turning 21 years old, Richard would be required to leave The Learning Center.
In September 1994, Richard's DCYF social worker attempted to transition him to MHRH for adult services in anticipation of Richard's twenty-first birthday. MHRH plans and provides services to persons with developmental disabilities and to persons with serious mental illness through two, separate administrative divisions of the department. The Division of Developmental Disabilities (formerly the Division of Mental Retardation) is charged with the responsibility to "provide or secure certain social, protective and other types of appropriate services for developmentally disabled citizens. . . ." G.L. 40.1-21-4.2(c). The Division of Integrated Mental Health Services is responsible for planning and developing a complete, comprehensive and integrated state-wide system of mental health services, with the highest priority given to individuals with serious mental illness. G.L. 40.1-5.4-1 et seq. Eligibility for services from each of the divisions within MHRH is enunciated in separate statutes, as well as in regulations.
Richard was first referred for services to DDD, which found him ineligible for services on January 12, 1995. (Letter to Richard Pacheco from Stephanie Horridge, MA, M.S.W.) That division then referred him for services to DIMH. Meanwhile, Richard's mother appealed the DDD decision and requested an informal hearing in accordance with MHRH rules. The DIMH also found Richard ineligible for services, and the informal hearing merged the question of Richard's eligibility for services from both divisions. Following the informal hearing and an interview with Richard by MHRH staff, the Executive Director upheld the determination that Richard was ineligible for services through either division on April 19, 1995. (Letter from Robert L. Carol, Ph.D.) Richard, through his mother, appealed the April decision and pursuant to MHRH rules requested a formal hearing for a determination of whether Richard is eligible for services.
The decision of the hearing officer states in pertinent part:
 "The petitioner, Richard P is not a person eligible for services provided by the Department's Division of Developmental Disabilities as he does not meet the statutory definitions of those individuals entitled to services provided or purchased by the Division.
 The petitioner, Richard P. does not meet the statutory definition of a person with serious mental illness, and is therefore not eligible for services through the publicly administered integrated state mental health service system." (Decision at 7.)
On appeal, Richard contends that the decision of the hearing officer is not supported by the record.
Standard of Review
The review of an agency decision by this Court is controlled by G.L. § 42-35-15(g). Section 15(g) provides:
 "(g) The court shall not substitute its judgment for that of the agency as to the weight of the evidence on questions of fact. The court may affirm the decision of the agency or remand the case for further proceedings, or it may reverse or modify the decision if substantial rights of the appellant have been prejudiced because the administrative findings, inferences, conclusions, or decisions are:
 (1) In violation of constitutional or statutory provisions; (2) In excess of the statutory authority of the agency; (3) Made upon unlawful procedure; (4) Affected by other error of law; (5) Clearly erroneous in view of the reliable, probative, and substantial evidence on the whole record; or (6) Arbitrary or capricious or characterized by abuse of discretion or clearly unwarranted exercise of discretion."
This section precludes a reviewing court from substituting its judgment for that of the agency in regard to the credibility of witnesses or the weight of evidence concerning questions of fact. Costa v. Registry of Motor Vehicles, 543 A.2d 1307, 1309 (R.I. 1988); Carmody v. R.I. Conflict of Interest Commission,509 A.2d 453, 458 (R.I. 1986). Therefore, this Court's review is limited to determining whether substantial evidence exists to support the hearing officer's decision. Newport Shipyard v. RhodeIsland Commission for Human Rights, 484 A.2d 893 (R.I. 1984). However, questions of law are not binding upon a reviewing court and may be freely reviewed to determine what the law is and its applicability to the facts. Carmody v. R.I. Conflicts ofInterests Commission, 509 A.2d at 458.
IS PLAINTIFF DEVELOPMENTALLY DISABLED PURSUANT TO G.L. §40.1-21-4.3(2)?
a. Is Plaintiff a "Mentally Retarded Developmentally DisabledAdult" Pursuant to § 40.1-21-4.3(1)?
The statutory definition of "developmentally disabled adult" applies to both mentally retarded adults, and non-mentally retarded adults with chronic disabilities. "Developmentally disabled adult" is defined as
 ". . . a person eighteen (18) years or older and not under the jurisdiction of the Department for Children and Their Families who is either a mentally retarded developmentally disabled adult or is a person with a severe, chronic disability which:
 (a) is attributable to a mental or physical impairment or combination of mental and physical impairments;
 (b) is manifested before the person attains age 22;
 (c) is likely to continue indefinitely;
 (d) results in substantial functional limitations in three or more of the following areas of major life activity:
 (i) Self care
 (ii) Receptive and Expressive Language
 (iii) Learning,
 (iv) Mobility
 (v) Self Direction
 (vi) Capacity for Independent living
 (vii) Economic Self Sufficiency; and
 (e) Reflects the person's need for a combination and sequence of special, interdisciplinary or generic care treatment, or other services which are of lifelong or extended duration and are individually planned and coordinated. . . .
 R.I. Gen. Laws 40.1-21-4.3(2)."
The definition of "mentally retarded developmentally disabled adult"
 "Shall mean a person eighteen (18) years and older and not under the jurisdiction of the department for children and their families, with significant sub-average general intellectual functioning two standard deviations below the norm, existing concurrently with deficits in adaptive behavior and manifested during the developmental period. G.L. 40.1-21-4.3(1)."
On appeal, Richard asserts that the hearing officer erred by finding that Richard was not a person with either mental retardation or a related condition. The hearing officer did not articulate findings of fact as to whether Richard was mentally retarded. The record establishes and fully supports a conclusion, however, that Richard is not mentally retarded. Although Richard has deficits in adaptive behavior, his IQ scores over the years have ranged between 74 and 90. Testimony at the hearing revealed that two standard deviations below the norm, the norm being 100, is an IQ score of 69. Richard's own exhibit, a recent psychiatric report, indicates Richard's IQ scores to be in the 80's and contains references to his being only borderline mentally retarded. (Petitioner's Exhibit 2.) Borderline mentally retarded does not equate to mentally retarded as defined in §40.1-21-4.3(1).
There was substantial evidence at the hearing that Richard was neither mentally retarded, nor a person with a "related condition" as that latter term is defined in the federal Medicaid regulation. Under the Medicaid definition, a developmentally disabled person is ". . . an individual who as defined by the Secretary is described within the term `mental retardation and related conditions' as defined in regulations as in effect on July 1, 1990 . . ." 42 U.S.C. § 1396 u (b). The applicable regulation states:
 "Persons with related conditions means individuals who have a severe, chronic disability that meet all
of the following conditions:
 (a) It is attributable to:
 (1) Cerebral palsy or epilepsy; or (2) Any other condition, other than mental illness, found to be closely related to mental retardation because this condition results in impairment of general intellectual functioning or adaptive behavior similar to that of mentally retarded persons, and requires treatment or services similar to those required for these persons.
 (b) It is manifested before the age of 22.
 (c) It is likely to continue indefinitely.
 (d) It results in substantial functional limitations in three or more of the following areas of major life activity; (1) Self-care. (2) Understanding and use of language. (3) Learning. (4) Mobility. (5) Self-direction. (6) Capacity for independent living."
42 C.F.R. § 435.1009. (Emphasis added.)
Richard argues that the definition of "developmentally disabled adult" under § 40.1-21-4.3(2) is broader in scope than the Medicaid funding definition which requires specific disabilities, such as cerebral palsy, mental retardation or a related condition. (Pet. Brief at 8.) In essence he argues that Chapter 21, section 4.3(2) does not require that an individual must be either mentally retarded or have a related condition to be eligible for services.
Rhode Island General Laws § 40.1-21-4.3(2) does not limit the definition of "developmentally disabled adult" to persons with mental retardation or to persons with conditions related to mental retardation. The plain language of § 4.3(2) applies to mentally retarded adults, as well as to non-mentally retarded disabled adults whose disability is "attributable to a mental or physical impairment or a combination of mental and physical impairment," and who meet functional criteria set out in this section. Rule 2.1 of MHRH rules and regulations states:
 "2.1. It is the intent of these rules and regulations to implement the statutory mandate under R.I. Laws Section 40.1-21.1 et seq. to expand the eligibility criteria for people served by the Division to include adults with developmental disabilities other than retardation."
There is no language that requires the disability to be similar or related to mental retardation. Further, Rule 3.3 makes it clear that an individual's functional abilities are determinative. It states:
 "3.3 The content of any evaluations or decisions resulting to eligibility will focus on functional abilities of the person in each of the seven major life activities as defined within these regulations under developmental disabilities."
Section 4.3(2) as it applies to non-mentally retarded disabled adults is patterned after the federal definition of "developmentally disabled" in the Developmentally Disabled Assistance Act, 42 U.S.C. §§ 6000-6081.
Section 6001(8) states:
 "The term "developmental disability" means a severe, chronic disability of an individual 5 years of age or older that —
 (A) is attributable to a mental or physical impairment or combination of mental and physical impairments;
 (B) is manifested before the individual attains age 22;
 (C) is likely to continue indefinitely;
 (D) results in substantial functional limitations in three or more of the following areas of major life activity —
 (i) self-care;
 (ii) receptive and expressive language;
 (iv) mobility;
 (v) self-direction;
 (vi) capacity for independent living; and
 (vii) economic self-sufficiency; and
 (E) reflects the individuals's need for a combination and sequence of special, interdisciplinary, or generic services, supports, or other assistance that is of lifelong or extended duration and is individually planned and coordinated. . . ."
42 U.S.C. § 6001(8) (Cum. Supp. 1995.)
The original federal definition of "developmental disability" was limited to a disability which
 "(A) (i) is attributable to mental retardation, cerebral palsy, epilepsy, or autism;
 "(ii) is attributable to any other conditions of a person found to be closely related to mental retardation because such condition results in similar impairment of general intellectual functioning or adaptive behavior to that of mentally retarded persons or requires treatment and services similar to those required for such persons; or
 "(iii) is attributable to dyslexia resulting from a disability described in clause (i) or
 (ii) of this subparagraph;
 "(B) originates before such person attains age eighteen;
 (C) has continued or can be expected to continue indefinitely; and
 "(I) constitutes a substantial handicap to such person's ability to function normally in society."
P.L. 94-103, Title I, Part E § 125, Oct. 4, 1975, 89 Stat. 496.
In 1978, Congress abandoned the diagnostic approach which limited the definition to the specific, categorical diagnoses of mental retardation, cerebral palsy, autism, epilepsy or other conditions closely related to mental retardation, and adopted the current functional approach, thereby expanding the definition to include all persons with disabilities attributable to mental or physical impairments who also meet the functional criteria. See
P.L. 95-602, Title V, § 503, Nov. 6, 1978, 92 Stat. 3004-3005;Ass'n For Retarded Citizens of N.D. v. Sinner, 115 F.R.D. 28, 31 (D.N.D. 1987). Section (4.3)(2) of the Rhode Island General Laws utilizes such a functional approach for disabled persons who are not definitionally mentally retarded. The court agrees with Richard that § 40.1-21-4.3(2) appears to be broader in scope than the Medicaid funding regulation, but after reviewing this record, the court finds that the criteria in section 4.3(2) were applied to Richard and that he does not satisfy them, as discussed infra.
b. Is Plaintiff Otherwise Developmentally Disabled Under G.L. §40.1-21-4.3(2)?
Having determined that the evidence supports the conclusion that Richard is not mentally retarded, this Court reviewed the record to determine whether there was evidence to support the conclusion that Richard is not otherwise developmentally disabled under Section 4.3(2).
By definition and by MHRH's own Rule 3.3, the focus of eligibility for services as a developmentally disabled adult who is not mentally retarded is on the functional abilities of the applicant in each of the seven major life activities enumerated in § 4.3(2)(D). Subsection D requires that the disability result in substantial functional limitations in three or more of the seven major life activities.
The hearing officer articulated no findings of fact as to whether Richard has substantial limitations in the enumerated areas. The court finds that there is ample, reliable evidence on this record that demonstrates that Richard does not meet the functional criteria of Section 4.3(2)(D). Therefore, the hearing officer's conclusion that Richard is not developmentally disabled is supported by the evidence and is affirmed.
There was conflicting testimony concerning whether Richard had substantial limitations in major life activities. Pauline Young, a social worker who met with Richard once a week in a counselling setting, testified that Richard lacked self-direction, had language deficits, and would not be able to hold a job. (Tr. at 61-64.) Debra Flussy, a behavioral specialist and the student-services coordinator at The Learning Center, testified that Richard was capable of self-care if his one-to-one aide was present or with staff present. (Tr. at 126-128.) She testified that Richard was once fired from a part-time job for his inappropriate behavior, but was re-hired, and that with the assistance of his one-to-one aide, has been successful in that employment. (Tr. at 116.)
The reports from The Learning Center indicate that although Richard requires prompts from staff, he can accomplish major life tasks. His academic record shows that Richard can read at about the sixth grade level and that he can perform two-digit multiplication and division. He can shop in the community, budget his money, and cook. (Joint Exhibit 4.) Robert Carl, Ph.D., who is the Executor Director of DDD, testified that based on documents from Richard's placements and also on reports from his staff who interviewed Richard, Richard did not have substantial limitations in the major life activities. (Tr. at 354-359.) Ira Smith, Chief Clinical Psychologist at DDD who interviewed Richard, testified that Richard was substantially deficient in self-direction, learning, and capacity to live independently, but that in his opinion the deficiencies were not attributable to a developmental disability.
Where there is conflicting testimony from equally qualified experts and there exists substantial evidence on both sides of the controversy, the better rule is to limit the extent of judicial review. Mendonsa v. Corey, 495 A.2d 257, 263 (R.I. 1985). This conclusion is consistent with the language of §45-24-15 which prohibits the weighing of evidence on questions of fact on judicial review. There was substantial evidence before the hearing officer in the present case that Richard was not substantially limited in three of the major life areas listed in § 4.3(2)(D). This court will not substitute its judgment under these circumstances. Id. The hearing officer's decision that Richard is not eligible for services through the DDD because he is not developmentally disabled is therefore affirmed.
DOES PLAINTIFF HAVE A SERIOUS MENTAL ILLNESS PURSUANT TO G.L. §40.1-5.4-7?
Section 7 of chapter 5.4 sets out the definition of "serious mental illness."
 "(a) "Serious mental illness" shall mean an illness which is biologically based, severe in degree and persistent in duration, which causes a substantially diminished level of functioning in the primary aspects of daily living and an inability to cope with the ordinary demands of life, which may lead to an inability to maintain stable adjustment and independent functioning without long-term treatment and support and which may be of lifetime duration. Serious mental illness includes schizophrenia, bi-polar disorders as well as a spectrum of psychotic and other severely disabling psychiatric diagnostic categories, but does not include infirmities of aging or a primary diagnosis of mental retardation, alcohol or drug abuse or antisocial behavior."
The initial eligibility determination for services through DIMH is made by the local community mental health center in the geographical area in which the applicant resides. G.L.40.1-5.4-8. Richard is an official resident of Bristol, Rhode Island. Documents on Richard from his various placements were reviewed by Carol Moser, the director of the East Bay Mental Health Center, who determined that Richard was not eligible for services. (Tr. at 402.)
However, after the initial ineligibility determination by East Bay, but before the adjudicatory hearing, Richard was evaluated by Barbara Coffey, M.D., who is a psychiatrist and the director of the Tourette's Clinic at McLean Hospital in Belmont, Massachusetts. The hearing officer admitted into evidence as a full exhibit the psychiatric report of Dr. Coffey consisting of nineteen pages. (Petitioner's Exhibit 2.) The report of Dr. Coffey contains several diagnoses for Richard, including major depressive disorder and Tourette's disorder. (Petitioner Exhibit 2.) At the hearing, Carol Moser of East Bay testified that major depressive disorder is a serious mental illness which would qualify an individual for services from MHRH through the local mental health center. (Tr. at 420-421.) The hearing officer, too, stated in her decision that major depressive disorder would qualify Richard for services. (Decision at 5.) But the hearing officer went on to state:
 "There is no indication in the report of the basis for the determination of the diagnosis of major depressive disorder. The record contains both educational and psychosocial assessments of the petitioner from the age of approximately ten (10) to the present and through three residential placements. The first mention of major depressive disorder, as well as several of the additional fifteen (15) diagnosis made by Dr. Coffey is found in the July, 1995 report. The Department's witnesses did not find the information to be dispositive, neither does this hearing officer." Id.
After reviewing the record, the court finds that there was no controverting, expert testimony presented at the hearing to dispute the diagnosis of major depressive disorder, and no evidence to dispute the competence of Dr. Coffey. The court does not believe that the absence of other psychiatric evaluations in the documents forwarded by DCYF to East Bay serves in any way to discredit Dr. Coffey.
Other witnesses testified that Richard suffers from depression. Kathryn Provost of DCYF, Debra Flussy from The Learning Center, and Pauline Young, Richard's counselor, all testified that Richard suffers from depression. (Tr. at 12, 52, 113.) Pauline Young also testified that depression is often associated with Tourette's disorder. (Tr. at 79-80.) The record also reveals that in 1994, there were two incidents of Richard's purposeful self-inflicted injuries. (Joint Exhibit 4 at 23.) The psychosocial assessment of Dr. Coffey's report states: "He [Richard] currently, at the Learning Center, has a one-to-one person with him at all times. He has tried hurting himself in the past by slitting his wrist and he also talks a lot about suicide." (Petitioner's Exhibit 2 at 16.)
The first page of Dr. Coffey's report is a local mental health center form entitled "Determination Form: Adults With Serious Mental Illness." (Petitioner's Exhibit 2 at 1.) The form consists of five enumerated sections which correspond with the five-part definition of "adults with serious mental illness" as set out in the explanatory attachments to the form. (Joint Exhibit 3 at 1-2.) The following statement appears below section five:
 "Positive Screening. If the client is scored "YES" or "NA" on each of the items 1 through 4 and the answer to at least one section of item 5 is "YES," it is likely that this client has a serious mental illness."
(Petitioner's Exhibit 2 at 1.)
Richard scored "Yes" or "NA" on each item.
In addition to the determination form, Dr. Coffey's report indicates that she had two sessions with Richard and also met with his mother and with Debra Flussy of The Learning Center. (Petitioners Exhibit 2.) The report includes cognitive test results, diagnostic summaries, and an impressively comprehensive account of Richard's medical, psychiatric, educational, and developmental histories. Id. All of these aspects appear to document Dr. Coffey's opinion.
At the hearing Carol Moser of East Bay testified that she had reviewed a copy of Dr. Coffey's report prior to the hearing, but that she did not change her opinion that Richard was ineligible for services. (Tr. at 410.) She testified that although major depressive disorder is a serious mental illness, there was none of the usual supporting documentation with the determination form. (Tr. at 424.) She further testified that she saw no other psychiatrist's reports for Richard, and that the diagnosis of major depressive disorder was not in any of the materials from his previous placements. (Tr. at 410.)
However, Carol Moser also testified that where information is lacking or if she has questions on an applicant, she would inquire of the person who wrote the report. (Tr. at 416.) She further testified that she made no inquiries of Dr. Coffey for additional information that supported the diagnosis of major depressive order in Richard's case. (Tr. at 416, 421.) Thus, the hearing officer should have had, but did not have, before her the basis of Dr. Coffey's diagnosis.
The court believes that in this case MHRH had the obligation to request from Dr. Coffey additional supporting information or at the least to give notice to her or to Richard that supporting documentation for the diagnosis was not included in Dr. Coffey's report.
The court therefore remands the case to the agency for the purpose of obtaining the supporting information it apparently requires and for the eventual presentation by the parties of additional evidence on the issue of whether or not Richard suffers from a serious mental illness, namely major depressive disorder, or any other serious mental illness which the additional evidence may disclose.
The court deems a remand proper in this case to correct a deficiency in the record and thus to afford the parties a meaningful review. Lemoine v. Dept. of Mental Health,113 R.I. 285, 290, 320 A.2d 611, 614 (1974).
 "The provision for such a remand would seem to be intended as a safety valve, permitting the reviewing court to require a second look at situations and conditions which might not warrant a reversal, but which, to the court reviewing the record, would indicate to it that the State Highway Commission may have acted on incomplete or inadequate information; or may have failed to give adequate consideration to an alternate route; or may have weighted its evaluation of the matter under consideration with the theory of the complete infallibility of its own engineers.
 "A remand for further consideration is not a determination that the State Highway Commission is wrong; but it is an indication that the disinterested court, which has reviewed the record, is not satisfied on the basis of that record that the State Highway Commission is right."
113 R.I. at 291-92, 320 A.2d at 615 (quoting State ex rel.Gunstone v. State Highway Comm'n, 72 Wn.2d 673, 674-75,434 P.2d 734, 735 (1967)).
Accordingly, the decision of the hearing officer is affirmed in part, and remanded in part for further proceedings. The decision on the issue of Richard's eligibility for services through DIMH is vacated. This court will retain jurisdiction pending the agency's further proceedings in the event that Richard may wish to pursue an appeal from the hearing officer's decision on the issue of eligibility for services through DIMH following the further proceedings.
Counsel shall prepare an appropriate order.