Aaron FRITH, Plaintiff,

v.

GALETON AREA SCHOOL DISTRICT,
et al., Defendants.

No. 3:CV–92–1877.

United States District Court,
M.D. Pennsylvania.

Sept. 20, 1995.

Stephen L. Axelrod, Susan B. Bolno, Philadelphia, PA, for plaintiff.

Robert F. Cox, Cox & Cox, Wellsboro, PA, Allan D. Goulding, Rosemary E. Mullaly, Curtin & Heefner, Doylestown, PA, for defendants Seneca Highlands Intermediate Unit and the Galeton defendants.

Louis A. Bove, Swartz, Campbell & Detwiler, Philadelphia, PA, for Coudersport defendants.

### MEMORANDUM

McCLURE, District Judge.

### BACKGROUND:

Plaintiff Aaron Frith alleges in this civil rights action[1] that his constitutional rights were violated by defendants' failure to place him in an appropriate educational program to address problems stemming, directly or indirectly, from his medical condition. Plaintiff was diagnosed in the eighth grade as suffering from Tourette's syndrome, a disorder of the nervous system characterized by tics: rapid, involuntary, sudden movements, sounds and other behaviors beyond the control of the individual. This behavior sometimes takes the form of socially-unacceptable comments, such as racial epithets and four-letter words. Such comments are also involuntary.[2]

---

**1.** 42 U.S.C. § 1983.

**2.** Tourette's syndrome is defined in medical terms as:

A syndrome of facial and vocal tics with onset in childhood, progressing to generalized jerking movements in any part of the body, with echolalia and coprolalia; once thought to have an unfavorable prognosis but recently shown to be responsive to treatment with butyrophenones.

*Mullins v. North Dakota Department of Human Services,* 483 N.W.2d 160, 161 n. 1 (N.D.1992), citing *Dorland's Illustrated Medical Dictionary,* (Twenty-fifth edition; 1974), p. 1520.

See also: *Witherspoon v. Ciba–Geigy Corp.,* 1986 WL 2138 at *1 (Tenn.Ct.App.1986) (Tourette's syndrome described as "a central nervous system disorder characterized by uncontrollable

Plaintiff attended the Galeton Elementary School from kindergarten through eighth grade. Prior to his admission to kindergarten, plaintiff was referred for psychological testing by Galeton School Superintendent Frank Flamish, Jr. and Principal Mack Grant to Charles Cole Memorial Hospital and Community Mental Health Center. A report generated by psychologist Jane Wingo diagnosed plaintiff as exhibiting numerous "neurological soft signs including awkwardness, disturbances of balance, hyperkinesis, motor overflow, problems with fine motor coordination and defective speech." Plaintiff was observed as exhibiting other unusual and inappropriate behavior.

Plaintiff continued to exhibit this behavior throughout his elementary education at Galeton. While enrolled at Galeton, plaintiff was, from time to time, referred for testing to determine the cause of the disruptive behavior he exhibited in the classroom. Plaintiff was referred by school officials to Cole Memorial Hospital where he was seen by Dr. Jack Goga and Widad Bazzoui, M.D. Plaintiff alleges that the doctors who saw him at Cole Memorial negligently failed to diagnosis his condition as Tourette's syndrome and prescribe an appropriate course of treatment.

Plaintiff alleges that as a result of the actions of the Galeton school officials and the Cole Memorial medical personnel named in this action, he was unable to complete his high school education, was forced to miss one and one-half years of school, was not properly educated and had the maturity level of a twelve or thirteen year old, despite testing indicating that he has a high I.Q.

Plaintiff left the Galeton school system at the end of the seventh grade and began attending the Coudersport Junior/Senior High School in Coudersport, Pennsylvania. As a result of his previous bad experiences, plaintiff became very fearful of school. In January, 1987, Dr. Bazzoui recommended that plaintiff be institutionalized. Plaintiff's mother, Beverly Frith, decided to have his condition evaluated by another psychologist, Penny Miller, Ph.D. Dr. Miller made a provisional diagnosis of Tourette's syndrome on plaintiff's second visit, which diagnosis was

motor and phonic tics that wax and wane in

subsequently confirmed, on March 19, 1987, by Dr. C. Berlin at the Hershey Medical Center. Plaintiff was then placed on medication which greatly benefitted him and markedly decreased his symptoms. Plaintiff remained, however, very fearful of school because of his prior experiences.

Plaintiff was enrolled as a student at the Coudersport Junior/Senior High School from September 1987, to January, 1991. Plaintiff alleges that defendants failed to take steps reasonably necessary to identify him as an exceptional child consistent with federal and state law. He further alleges that he was assigned to homebound instruction, a form of special education, without the benefit of the procedural safeguards to which he was entitled under the law. In 1991, plaintiff was unlawfully dismissed from school and thereby denied the opportunity to complete his education.

Plaintiff, who was born May 5, 1973, brought this action, at age 19, for the alleged violation of his civil rights and his rights under federal statutory law by school officials and treating psychologists and psychiatrists.

Plaintiff brings this action against: the Seneca Highlands Intermediate Unit (the Seneca Highlands IU); the Galeton Area School District (Galeton); and the Coudersport Area School District (Coudersport) and employees and administrators of those entities with whom he and his parents interacted over the years. He also brings claims against the Department of Community Mental Health (DCMH); the Charles Cole Memorial Hospital (the hospital); Dr. Widad Bazzoui; and Dr. John Goga.

Initially, plaintiff alleged violations of his Fifth, Eighth and Fourteenth Amendment rights; the Civil Rights Act of 1981, 42 U.S.C. § 1983; the Education for the Handicapped Act (EHA) of 1975 (now the Individuals With Disability Education Act (IDEA) or the Act), 20 U.S.C. §§ 1401–1485; Section 504 of the Vocational Rehabilitation Act of 1973, 29 U.S.C. § 794 (Section 504); the Pennsylvania Constitution; Pennsylvania

severity.").

regulatory and statutory law, and Pennsylvania common law.

Counts I, IV, V, VI and VIII of plaintiff's original complaint[3] were dismissed for failure to exhaust administrative remedies and/or for failure to state a cause of action. Plaintiff was granted leave to filed an amended complaint alleging facts demonstrating why the exhaustion requirement should be excused, if that is his contention.

Plaintiff's amended complaint asserts the following claims: 1) a civil rights claim against Galeton (Count I); 2) a negligence claim against Dr. Bazzoui, Dr. Gogh, the hospital and the Galeton defendants (Count II); 3) a malpractice claim against Dr. Bazzoui and Dr. Gogh, the hospital and the Department of Community of Mental Health (Count III); 4) a civil rights claim against Coudersport defendants and the Seneca Highlands IU (Count IV); 5) an EHA claim against Coudersport and Seneca Highlands IU (Count V); 6) a section 504 claim[4] against Coudersport and Seneca Highlands IU (Count VI); 7) state statutory law claims against Coudersport defendants and Seneca Highlands IU (Count VII); and 8) a claim for punitive damages against all defendants (Count VIII).

Defendants moved to dismiss the amended complaint. In an order dated January 12, 1995, this court granted defendants' Rule 12(b)(1)/12(b)(6) motions in part. Under the court's ruling, the claims which survived were:

Count I—civil rights/IDEA claims asserted under section 1983 and grounded in the IDEA, and the Due Process Clause and Equal Protection Clauses of the Fourteenth Amendment[5] to the United States Constitution—with demands for relief under the IDEA limited to claims for reimbursement or compensation for educational services necessary to make up for the deficiency in those provided by the defendants—IDEA claims survive as against the school district and Seneca Highlands IU only, since for reasons explained in the prior memorandum of April 11, 1994, only those claims grounded in alleged noncompliance with the IDEA are viable. Only the school district, and possibly Seneca Highlands IU, have a legal duty to provide plaintiff with the rights accorded him under the IDEA.

Count II—negligence claim—survives against Drs. Bazzoui and Gogh, the Department of Community Mental Health, and Charles Cole Memorial Hospital only;

Count III—malpractice claim—survives against Drs. Bazzoui and Gogh, the Department of Community Mental Health, and Charles Cole Memorial Hospital only;

Count IV—civil rights/IDEA claims asserted under section 1983—and grounded in the IDEA, and the Due Process Clause and Equal Protection Clauses of the Fourteenth Amendment[6] to the United States Constitution—with demands for relief under the IDEA limited to claims for reimbursement or compensation for educational services necessary to make up for the deficiency in those provided by the defendants;

IDEA claims survive as against the school district and Seneca Highlands IU only, since for reasons explained in the prior memorandum of April 11, 1994, only those claims grounded in alleged noncompliance with the IDEA are viable. Only the school district, and possibly Seneca Highlands IU, have a legal duty to provide plaintiff with the rights accorded him under the IDEA.

Count V—EHA claim—survives as against Coudersport and Seneca Highlands IU only

Count VI—Section 504 claim, Vocational Rehabilitation Act of 1973, 29 U.S.C. § 794—

---

**3.** Plaintiff's original complaint contained headings listing twelve counts, but contained, in actuality, only eight counts or distinct claims for relief. For an explanation of our re-numbering system, see the prior order dated April 11, 1994.

**4.** 29 U.S.C. § 794, a reference to section 504 of the Rehabilitation Act of 1973.

**5.** Plaintiff's asserted civil rights claim under the Due Process Clause of the Fifth Amendment to the United States Constitution was dismissed as duplicative.

**6.** Plaintiff's asserted civil rights claim under the Due Process Clause of the Fifth Amendment to the United States Constitution was dismissed as duplicative.

survives as against Coudersport and Seneca Highlands IU only;[7]

Count VII—Claims arising out of state statutory and regulatory law—None survives for reasons stated in the prior memorandum dated April 11, 1994.

Count VIII—Claim for punitive damages—survives as against all defendants

All claims identified above as surviving were stricken with prejudice, and all defendants who had not yet filed an answer to plaintiff's amended complaint were granted twenty days from the date of the court's memorandum to file the same.

The court's order and memorandum of January 12, 1995 generated the filing of the following: 1) a letter from counsel for the Coudersport defendants requesting that the January 12, 1995 order be vacated to allow the parties to supplement the record with information obtained in the course of discovery; and 2) a motion filed by plaintiff seeking additional time for the filing of a motion for reconsideration of the court's January 12, 1995 order.

On January 31, 1995, the court entered an order: 1) vacating in part the order dated January 12, 1995; 2) granting all parties additional time to supplement the record; 3) granting plaintiff's motion for an extension as moot; and 4) granting plaintiff's motion to compel the deposition of John Garman.

Under our order and memorandum of January 31, 1995, those claims dismissed with prejudice pursuant to the January 12, 1995 order on the ground that the remedies sought are unavailable to plaintiff, under existing law, remained dismissed with prejudice. Only those portions of the later order which dismissed, or declined to dismiss, claims on exhaustion grounds were vacated.

Both sides were given the promised opportunity to file supplemental briefs on the exhaustion issue. Supplemental briefs and other supporting documentation has been filed, and we are now in a position to rule on the outstanding motions.

Currently before the court are: 1) plaintiff's motion for reconsideration of the order filed January 12, 1995 (record document no. 88); 2) the Coudersport defendants' motion to dismiss plaintiff's amended complaint (record document no. 89); and 3) the Seneca Highlands IU and Galeton defendant's supplemental motion to dismiss the amended complaint (record document no. 91).

For the reasons which follow, we will enter an order: 1) denying as moot plaintiff's motion for reconsideration of the order dated January 12, 1995 (record document no. 88); 2) granting the motion to dismiss plaintiff's amended complaint filed by the Coudersport defendants (record document no. 89); and 3) granting the motion to dismiss plaintiff's amended complaint filed by the Seneca Highland IU and the Galeton defendants (record document no. 91). Only the claims asserted against Dr. Bazzoui, Dr. Gogh, the hospital and the Department of Community of Mental Health (Counts II and III) remain.

## DISCUSSION

**Proof that exhaustion requirement has been met**

Courts have uniformly held that plaintiffs are precluded from seeking relief in state or federal court under the IDEA or section 1983 until they have exhausted their administrative remedies. See, e.g., *Christopher W. v. Portsmouth School Committee*, 877 F.2d 1089, 1093–94 (1st Cir.1989) and *Stauffer by DeMarco v. William Penn School District*, 829 F.Supp. 742, 748 (E.D.Pa.1993). "EHA exhaustion must occur

---

7. Left open, under our prior order and memorandum, was the question of whether compensatory damages, other than reimbursement for educational expenses may be recoverable under section 504, (See: *Hall v. Knott County Board of Education*, 941 F.2d 402, 407 (6th Cir.1991) ("It may be true ... that damages may be awarded for violations of the anti-discrimination provisions of § 504 of the Rehabilitation Act."), while at the same time noting that there may be impediments to plaintiff's maintenance of any section

504 claim at all, (See: *Barwacz v. Michigan Department of Education*, 674 F.Supp. 1296, 1307 (W.D.Mich.1987)) ("[W]here ... whatever remedy might be provided under § 504 is provided with more clarity and precision under the EHA, a plaintiff may not circumvent or enlarge on the remedies available under the EHA by resort to § 504."), citing *Smith v. Robinson*, 468 U.S. 992, 1021, 104 S.Ct. 3457, 3473, 82 L.Ed.2d 746 (1984).

before plaintiffs may file an action under any other federal law seeking relief that is also available under the EHA." *Waterman v. Marquette–Alger Intermediate School District,* 739 F.Supp. 361, 365 (M.D.Mich.1990), and *Hayes v. Unified School District No. 377,* 877 F.2d 809, 812 (10th Cir.1989). Failure to exhaust administrative remedies is grounds for dismissal of the complaint on a Rule 12(b)(6) motion. *Gardner v. School Board Caddo Parish,* 958 F.2d 108, 111–12 (5th Cir.1992).

For the reasons discussed previously, the viability of plaintiff's claims asserted under the IDEA, section 504 and section 1983 against all defendants, the only federal claims asserted, all turn on the question of whether he can demonstrate that he qualifies for an exemption from the administrative exhaustion requirement.

■ Although the policy of requiring exhaustion of administrative remedies is "a strong one, some exceptions have been recognized." *Komninos v. Upper Saddle River Board of Education,* 13 F.3d 775, 778 (3d Cir.1994). Recognized exceptions are: 1) a showing that the parents were unaware of their right of administrative appeal because the school district failed to notify them of their right to pursue an administrative remedy; 2) a showing that the administrative process would be futile or inadequate; 3) if the issue presented is purely a legal question; 4) a showing that the administrative agency cannot grant effective relief; or 5) if requiring exhaustion "would work 'severe or irreparable harm' upon a litigant." *Id.* See also: *Honig v. Doe,* 484 U.S. 305, 327, 108 S.Ct. 592, 606, 98 L.Ed.2d 686 (1988); and *Lester H. v. Gilhool,* 916 F.2d 865 (3d Cir. 1990); and *Gardner v. School Board Caddo Parish,* 958 F.2d 108, 111–12 (5th Cir.1992).

Frith argues that he is exempt from the exhaustion requirement because his parents never received proper notice of their due process right to challenge decisions made by the district and school administrators.

**Notice requirements**

■ Notice requirements are imposed pursuant to 20 U.S.C. § 1415(a), which provides:

> Any State educational agency, any local educational agency, and any intermediate educational unit which receives assistance under this subchapter shall establish and maintain procedures in accordance with subsection (b) through subsection (e) of this section to assure that children with disabilities and their parents or guardians are guaranteed procedural safeguards with respect to the provision of free appropriate public education by such agencies and units.

*Id.*

Required procedures, set forth in 20 U.S.C. § 1415(b), include:

> (A) an opportunity for the parents or guardian of a child with a disability to examine all relevant records with respect to the identification, evaluation, and educational placement of the child, and the provision of a free appropriate public education to such child, and to obtain an independent educational evaluation of the child;

> (B) procedures to protect the rights of the child whenever the parents or guardian of the child are not known, unavailable, or the child is a ward of the State, including the assignment of an individual (who shall not be an employee of the State educational agency, local educational agency, or intermediate educational unit involved in the education or care of the child) to act as a surrogate for the parents or guardian;

> . . . .

and

> (E) an opportunity to present complaints with respect to any matter relating to the identification, evaluation, or educational placement of the child, or the provision of a free appropriate public education to such child.

> (2) Whenever a complaint has been received under paragraph (1) of this subsection, the parents or guardian shall have an opportunity for an impartial due process hearing which shall be conducted by the State educational agency or by the local educational agency or intermediate educational unit, as determined by State law or by the State educational agency. No hearing conducted pursuant to the require-

ments of this paragraph shall be conducted by an employee of such agency or unit involved in the education or care of the child.

*Id.*

Notice obligations on the part of the school district are triggered when or if the agency or unit—

(i) proposes to initiate or change, or

(ii) refuses to initiate or change,

the identification, evaluation, or educational placement of the child or the provision of a free appropriate public education to the child.

20 U.S.C. § 1415(b)(1)(C).

Regulation section 300.504 elaborates on the requirements that notice be given:

(a) Notice. Written notice that meets the requirements of s 300.505 must be given to the parents of a child with a disability a reasonable time before the public agency—

(1) Proposes to initiate or change the identification, evaluation, or educational placement of the child or the provision of FAPE[8] to the child; or

(2) Refuses to initiate or change the identification, evaluation, or educational placement of the child or the provision of FAPE to the child.

(b) Consent; procedures if a parent refuses consent.

(1) Parental consent must be obtained before—

(i) Conducting a preplacement evaluation; and

(ii) Initial placement of a child with a disability in a program providing special education and related services.

(2) If State law requires parental consent before a child with a disability is evaluated or initially provided special education and related services, State procedures govern the public agency in overriding a parent's refusal to consent.

(3) If there is no State law requiring consent before a child with a disability is evaluated or initially provided special education and related services, the public agency may use the hearing procedures in §§ 300.506–300.508 to determine if the child may be evaluated or initially provided special education and related services without parental consent. If it does so and the hearing officer upholds the agency, the agency may evaluate or initially provide special education and related services to the child without the parent's consent, subject to the parent's rights under §§ 300.510–300.513.

(c) Additional State consent requirements. In addition to the parental consent requirements described in paragraph (b) of this section, a State may require parental consent for other services and activities under this part if it ensures that each public agency in the State establishes and implements effective procedures to ensure that a parent's refusal to consent does not result in a failure to provide the child with FAPE.

34 C.F.R. § 300.504.[9]

■ The regulations require the district to send written notice to a child's parents before identifying, evaluating, or placing the child under the IDEA. *Kroot v. District of Columbia,* 800 F.Supp. 976, 982 (D.D.C. 1992), citing 34 C.F.R. § 300.504. See also: 34 C.F.R. § 300.505.

The purpose of requiring such notice is to ensure that parents receive sufficient information about where the agency proposes to place their child and why that placement was chosen, so that parents may reach an informed conclusion about whether the placement will provide an appropriate education. The information in the notice, along with the IEP, the MDT Report, and all other information the agency has provided to the parents, should enable them to decide whether to contest the

---

8. FAPE is the acronym for a free appropriate public education.

9. Federal law incorporates state standards, and a school district may violate the IDEA if it fails to

satisfy the more stringent state law requirements. *Doe v. Board of Education,* 9 F.3d 455, 457 (6th Cir.1993) (per curiam), *cert. denied,* —— U.S. ——, 114 S.Ct. 2104, 128 L.Ed.2d 665 (1994).

placement. If the notice provides such information, then it is sufficient.

*Smith v. Squillacote,* 800 F.Supp. 993, 998 (D.D.C.1992).

■ Consistent with these purposes, the courts have held that technical non-compliance with the notice provisions is not a violation of the Act if the parents had actual notice and were not deprived of any substantive right. See: *Thomas v. Cincinnati Board of Education,* 918 F.2d 618, 625 (6th Cir.1990) (Technical defects do not result in a violation of the IDEA if there is no substantive deprivation); *Cordrey v. Euckert,* 917 F.2d 1460, 1467 (6th Cir.1990), *cert. denied,* 499 U.S. 938, 111 S.Ct. 1391, 113 L.Ed.2d 447 (1991); *Doe v. Defendant I,* 898 F.2d 1186, 1190–91 (6th Cir.1990) (Technical defects are not sufficient to render the IEP inappropriate if the parents and district are aware of the relevant information.); *Chuhran v. Walled Lake Consol. Schools,* 839 F.Supp. 465 (E.D.Mich.1993), *aff'd per curiam,* 51 F.3d 271, 1995 WL 138882 (6th Cir.1995); *Hiller v. Board of Education,* 743 F.Supp. 958, 970 (N.D.N.Y.1990) (violation of notice requirements that does not prejudice child or parents need not result in conclusion that child had been denied "free appropriate education" under Act), and *Max M. v. Illinois State Board of Education,* 629 F.Supp. 1504, 1518 (N.D.Ill.1986). Cf. *Jackson v. Franklin County School Board,* 806 F.2d 623 (5th Cir. 1986); and *Hall v. Vance County Board of Education,* 774 F.2d 629, 635 (4th Cir.1985) (same); and *Edwards–White v. District of Columbia,* 785 F.Supp. 1022 (D.D.C.1992) (Parent's request for due process hearing constituted reasonable notice that parent was dissatisfied with school district's placement of her handicapped child, obligating school district under Education for All Handicapped Children Act to review and possibly revise child's individualized educational program.)

## PLAINTIFF'S EDUCATIONAL HISTORY

Because the issues before us turn in part on what notice, if any, plaintiff's parents received from the school district, we begin by reviewing the history of the Friths' interactions with school district personnel and administrators over the years and the decisions made about plaintiff's education.

### The years at Galeton

■ Plaintiff attended the Galeton schools from kindergarten through seventh grade. Although he exhibited unusual behaviors throughout his attendance there and even prior to his admission, and was referred for psychological testing a number of times, he was not diagnosed as suffering from Tourette's Syndrome while a student at Galeton.

An IEP prepared for him on February 1, 1980, when he was six years of age, stated: "Aaron will be in full-time regular education and attend speech correction services appropriate to need." (Garman deposition, exhibit no. 4) A second IEP prepared for Aaron on May 23, 1980, stated essentially the same thing. (Garman deposition, exhibit no. 7)

Standardized intelligence testing indicated that he was of average intelligence. He also received average grades until the seventh grade. In grades one through six, he received mostly "B's" and "C's" with the occasional "A." In the seventh grade, his grades plummeted. During that year, he received failing or incomplete grades in most subjects. (Garman deposition, exhibit no. 4) His behavior was viewed as a disciplinary problem, not a problem which required his placement in special education. (Garman deposition at pp. 41–50)

Aaron received in-school suspensions while at Galeton only in the seventh grade. That year he received in-school suspensions totalling less than nine days for disciplinary infractions. According to Garman, he was placed in a room adjacent to the school office while under such suspensions. Students were monitored by the school secretaries in the adjacent office. Students on suspension received the same work as their counterparts in class that day and were responsible for making-up the work they missed. Parents were routinely notified by telephone or by mail of such suspensions.

Throughout his attendance at the Galeton schools, plaintiff was classified throughout as a regular student. At no point while Aaron was a student at Galeton did his parents

request formal evaluation or formally protest decisions made about his academic career.

**Galeton defendants' motion to dismiss**

Plaintiff has produced nothing to justify his argument for exemption from the exhaustion requirement with respect to his claims against Galeton. He merely reasserts allegations from the complaint, which are not sufficient to rebut the extensive documentary and testimonial evidence submitted by defendants on this issue.

In our prior memorandum, we stated that if there were evidence that plaintiff was repeatedly separated from other students and placed in a room separate and apart from his classmates, as he alleges, such evidence could arguably support his claim that he was placed in a *de facto* separate program, triggering parental notification requirements. We allowed plaintiff an opportunity to conduct additional discovery on this issue.

Following the opportunity for additional discovery, these facts emerge as unrebutted by plaintiff: 1) Aaron began school at Galeton as a student in the regular program—that classification never changed; 2) although plaintiff points out that an IEP was prepared for him—what he does not point out is that the IEP pertained only to some pronunciation difficulties which he was having in the first grade and, moreover, that the IEP stated that he was classified as a "fulltime regular education" student who would "attend speech correction services appropriate to need." (Garman deposition, exhibit nos. 4 and 7); 3) Aaron's progress through grades one through six was fairly normal—the only indication of a problem was repeated disciplinary incidents; 4) his grades to the extent they can be considered a reflection of his acclimation to school and academic progress—during that period were, in fact, fairly good—consisting mostly of "B's" and "C's" with a smattering of "A's"; 5) it was not until the seventh grade that his academic performance and his behavior declined precipitously; 6) that year, he received in-school suspensions totaling nine days for discipline problems; 7) defendants have produced evidence (and plaintiff has produced no evidence to the contrary) that these suspensions were the only instances of disciplinary isolation

(with the possible exception of occasions on which he had to stay inside during recess); 8) they have also produced evidence, also unrebutted, that during these suspensions, Aaron was placed in a room adjacent to the school office, subject to the supervision of the office secretaries, and was given the same school work as the students in his class were doing that day.

Nothing in any of this triggered an obligation on the part of the district to notify the Frith's of their due process rights. See the discussion at pp. 11–15 *supra*, on the notice requirements imposed by 20 U.S.C. § 1415. See also: *Hiller*, (School did not commit procedural violation by failing to notify child's parents of its decision not to refer child to committee on special education (CSE) where child had not been declared handicapped child on his entry into school; teacher believed child had learning problem and not "disability" and evaluation of any disability was result of request from child's parent and not due to teacher's belief that child was handicapped.) Cf. *Doe v. Rockingham County School Board*, 658 F.Supp. 403 (W.D.Va.1987) (School board and superintendent, who learned of student's learning disability while he was under disciplinary suspension, were required to give written notice of his rights and full procedural remedies of Education for All Handicapped Children Act.)

We therefore find no basis for waiving the exhaustion requirement on grounds that defendants failed to fulfill their duty to notify the Friths of their due process right to a hearing.

■ Plaintiff also argues that he is entitled to a waiver under the futility exception. We again disagree. There is nothing in the record before us to indicate that resort to administrative remedies would, at this stage be futile. As we have stated before, plaintiff has the right to file administrative claims for compensatory education, even at this late date. We find nothing in the record to compel the conclusion that resort to such remedies would be futile.

■ To the extent he is asserting a right to proceed under the exception acknowledged

in *Lester H.*, i.e. that only legal issues remain, that assertion also fails. There is clearly a factual dispute on many issues relating to, *inter alia*, what Galeton teachers and administrators involved with Aaron over years did or should have done, whether they should have been aware that he had some serious emotional or psychological difficulty that was causing him to act out, etc., what they should have done about this realization if they had such knowledge, etc.

We find, in conclusion, no justification for waiving the exhaustion requirement with respect to the claims asserted against Galeton and will dismiss all remaining claims asserted against the Galeton defendants on that ground.

**The years at Coudersport**

█ Plaintiff transferred to Coudersport Junior/Senior High School as an eighth grade student in the fall of 1986. (Beverly Frith deposition at pp. 9–10)[10] and (Record document no. 90, exhibit "H", Harpst Affidavit, ¶ 4) He again had difficulties with school.

The school contacted his mother about repeated incidents of tardiness. According to Beverly Frith, he was having phobic attacks which made it difficult for him to enter school and for which he was under psychiatric care. (Beverly Frith deposition at p. 12) Eventually, he was referred for diagnosis at the Hershey Medical Center, where he was diagnosed as suffering from Tourette's Syndrome in February of 1987. (Beverly Frith deposition at p. 13). A recommendation of homebound instruction was made by Ruth Neipris, Senior Psychiatric Social Worker at Hershey Medical Center (Record document no. 90, exhibit "G"–11) A further recommendation for homebound tutoring was made by Dr. Bazzoui in a letter dated March 30, 1987 addressed to Coudersport Junior/Senior High School principal Terry Erway.

Following that diagnosis, the school district sent his parents a "Request for Permission to Evaluate." The request contained a

notice advising them of their right to request a hearing concerning the proposed evaluation of Aaron. (Record document no. 90, exhibit "H", Harpst Affidavit, ¶¶ 5–9) Beverly Frith signed the request on February 19, 1987 and returned it to school administrators. (Record document no. 90, exhibit "G"–2) The form which she signed contained two signature lines. Above one, the one on which she placed her signature, the form stated: "If you agreed to an evaluation as outlined above, please sign here." *Id.* Above the second, where she did not place her signature, there was the following:

> If you do NOT agree to an evaluation as outlined above at this time, please sign here. We will contact you to arrange a personal conference as soon as possible. You also have the right to request a hearing concerning this proposed evaluation.

*Id.* Beverly Frith opted not to pursue her right to request a hearing concerning the proposed evaluation. (Beverly Frith deposition at p. 19–20). Pursuant to Beverly Frith's consent, psychological, psychiatric and social evaluations were performed on Aaron on March 12, 23 and 30 and September 23, 1987.

During the period, Beverly Frith sought the advice of counsel. She retained the services of William Hebe, Esq., who, in a letter dated September 15, 1987, addressed to school superintendent Joseph DeRenzis, requested, *inter alia*, that the district work toward establishing a program for Aaron whereby he would be tutored for an hour each day outside the school. (Record document no. 90, exhibit "G"–6)

A Conference Meeting was held on October 26, 1987 to review the findings and recommendations of the multi-disciplinary teams (MDT's) who had evaluated Aaron and assess how his educational needs could be met. (Harpst Affidavit, ¶¶ 11–16[11] and DeRenzis affidavit, ¶¶ 6–9[12]) Present at the meeting

---

10. Beverly Frith's deposition is included within Coudersport's exhibits submitted in support of its motion (record document no. 90) as exhibit "F".

11. Thomas Harpst's affidavit is included as part of Coudersport's exhibits submitted in support of

its motion (record document no. 90) as exhibit "H".

12. Superintendent DeRenzis' affidavit is included as part of Coudersport's exhibits submitted in

were Gary and Beverly Frith, their attorney, William Hebe, Esq., two clinical psychologists who had evaluated Aaron, and school and intermediate unit officials.

At that meeting, the Friths were told that: 1) the MDT's who had evaluated Aaron had concluded that he was not an "exceptional" student and the basis for that conclusion; and 2) that it was their recommendation that Aaron remain a student in the regular education curriculum. (Beverly Frith deposition at pp. 40 and 45)

Follow-up correspondence addressed to the Friths reviewed the conclusions reached at the October, 26, 1887 meeting and requested their signature on a "Notice of Recommended Assignment," and other parental notification forms (collectively NORA) forms enclosed. (Beverly Frith deposition at pp. 39–45 and record document no. 90, exhibits "G"–4 and G–21) The NORA restated that Aaron remain classified as a regular education student and included three pages discussing the Frith's due process rights under what was then the Education of All Handicapped children Act (EAHCA) and is now the IDEA. The Form B Notice enclosed also restated the MDT's conclusion that Aaron did not qualify for a special education program and advised the Friths of their right to review all data compiled by the district on their son, to request a conference on the evaluation findings and Aaron's educational needs, or to request a due process hearing. (See: Harpst Affidavit, ¶¶ 16–20)

The forms were accompanied by a letter from Guidance Counselor Thomas A. Harpst stating that, as was concluded at the MDT meeting held October 26, 1987, Aaron was a "nonexceptional student" and was to "continue in the regular education mode" receiving instruction at home for the present time with the hope that he would, eventually be able to return to a classroom setting. (Record document no. 90, exhibit "G"–21)

Beverly Frith signed the NORA on November 18, 1987, thereby acknowledging her consent that Aaron remain classified as a regular education student. (Beverly Frith deposition at pp. 42–45). The NORA contained two signature lines. She signed opposite the statement was said: "*I approve* this recommendation and do not wish to request a pre-hearing conference of a hearing." She did not sign opposite the statement which read: "*I do not approve* this recommendation. I request a pre-hearing conference."

The attached documents provided extensive details about the Friths rights of administrative appeal, spelling out in detail and in comprehensible language which such rights were and how they could be invoked. (Record document no. 90, exhibit "G"–4) This information, provided in the form of a letter to the parents, included such things as details about the pre-hearing conference and hearing, as well as citations to the applicable laws and regulations. *Id.*

Aaron remained classified as a regular education student throughout the remainder of his academic career at Coudersport. Although he carried out his studies at times through homebound instruction, at times in a classroom setting and at times at the public library, his classification was never changed.

Under Coudersport school district policy, homebound instruction is not a form of special education. It is defined by school district policy as a form of individualized instruction appropriate for "students confined to home or hospital for ... illness or injury; or when ... recommended for psychological or psychiatric reasons." (Record document no. 90, exhibit "G"–1)

Aaron continued on a program of homebound instruction into the 1988–89 school year consistent with the recommendation of his pediatric neurologist, Dr. Cadman. (Record document no. 90, exhibit "G"–22) Beverly Frith knew of the program and agreed at the time that it was best for her son. She requested approval from the district for homebound instruction in a letter dated September 12, 1988. (Record document no. 90, exhibit "G"–23) Later during the 1988–89, school year, attempts were made to gradually reintroduce Aaron into the classroom setting. This, again, was done with Beverly Frith's knowledge and consent. She did not request any further evaluation or a hearing on her

support of its motion (record document no. 90)       as exhibit "I".

son's assignment. (Beverly Frith deposition at p. 53)

In a letter dated February 24, 1989, Dr. Penny Miller requested that Aaron resume attending classes full-time. (Record document no. 90, exhibit "G"–24)

Aaron began eleventh grade in the fall of 1989. Beverly Frith advised school officials that she had chosen to have him privately tutored at home that year and that he would not be attending classes. (Beverly Frith deposition at pp. 54–58) She stated this in a letter dated September 5, 1989 addressed to School Superintendent Derenzis. (Record document no. 90, exhibit "G"–25) This decision was somewhat contrary to the recommendation and diagnosis of Aaron's clinical psychologist, Dr. Miller, who stated, in a report dated September 19, 1987 addressed to Coudersport Principal Larry Frank, that Aaron had a history of panic attacks while attending school due to his Tourette's Syndrome going undiagnosed and untreated for a number of years, but had made substantial progress in overcoming these difficulties and was able, in his professional opinion, to attend school and participate in normal school activities. Aaron, however, continued to refuse to attend class. (Record document no. 90, exhibit "G"–29)

These issues were discussed at a conference held November 2, 1989 attended by the Friths, Dr. Miller, school administrators and a representative from County Children and Youth Services (CYS). It was agreed that homebound instruction would continue. That recommendation was accepted by the school board on November 15, 1989. No protest, objection or request for reconsideration was filed by the Friths.

Aaron began twelfth grade at Coudersport in the fall of 1990. On June 11, 1990, a conference was convened to discuss Aaron's situation. It was agreed at that meeting that Aaron would undergo further evaluation prior to the start of the school year. Before the evaluation was conducted, Beverly Frith received and signed a "Request for Permission to Evaluate" which advised her of her right to requested a hearing on the proposed evaluation of Aaron. (Harpst Affidavit, ¶¶ 22–27) She did not request a hearing. (Beverly

Frith deposition at pp. 81–83) and (record document no. 90, exhibit "G"–32) This form contained the same type of signature line arrangement as the one she had signed in 1987. The form contained two signature lines. Above one, the one on which she placed her signature, the form stated: "If you agreed to an evaluation as outlined above, please sign here." *Id.* Above the second, where she did not place her signature, there was the following:

> If you do NOT agree to an evaluation as outlined above at this time, please sign here. We will contact you to arrange a personal conference as soon as possible. You also have the right to request a hearing concerning this proposed evaluation.

*Id.* Beverly Frith opted not to pursue her right to request a hearing concerning the proposed evaluation.

In a letter dated September 27, 1990 addressed to Beverly Frith, Larry Frank, principal of the Coudersport Junior Senior High School stated that homebound instruction was being terminated and that it was the school's position that he henceforth be "considered as a full-time regular education student with special needs." The letter mapped out a program to deal with Aaron's "special needs." (Record document no. 90, exhibit "G"–34)

The evaluation was performed by Seneca Highlands IU. (Record document no. 90, exhibit "G"–33). On October 3, 1990, the MDT panel recommended that Aaron remain classified as a non-exceptional student and that he pursue a regular educational program with some modifications. (Record document no. 90, exhibit "G"–35) Those recommendations were communicated to the Friths in a letter dated October 5, 1990. (Record document no. 90, exhibit "G"–35) The proposal was that Aaron receive tutoring at the school and gradually progress to spending increasing amounts of time in a classroom setting. The letter further stated that it was the unanimous conclusion of the MDT that Aaron "is not to be considered as a special education student. It is their conclusion that Aaron is to be considered a regular education student who has special needs." *Id.*

Dr. Cadman issued a report on October 9, 1990 recommending that Aaron receive homebound instruction for five hours a week over the school year. In a follow up letter to Beverly Frith dated October 15, 1990, Superintendent DeRenzis reviewed the various expert opinions provided over the years concerning Aaron's proper placement, and rejected the Frith's request for continuing homebound instruction, on the grounds that such instruction was never intended to be long-term and that it had proven unsuccessful in the past due to what he characterized as Aaron's uncooperative attitude and his unwillingness to "accept his responsibilities as a student." *Id.* The last sentence of Dr. DeRenzis's letter reminded Beverly Frith that she had a right to request a due process hearing if dissatisfied with the school's recommendation. *Id.*

Beverly Frith received similar information from a representative of the Pennsylvania Tourette's Syndrome Association, who advised her to request a hearing and further evaluations for Aaron. However, no hearing or further evaluations were requested. (Beverly Frith deposition at pp. 100–01 and record document no. 90, exhibit "N")

Aaron did not attend classes at Coudersport that year. At 17, he was beyond compulsory school age. Beverly Frith received a letter from Dr. DeRenzis dated February 5, 1991 advising her that Aaron had been withdrawn from the school rolls effective January 31, 1991 and that he had not completed his education. She did not formally protest that action. (Beverly Frith deposition at pp. 110–111 and Harpst affidavit, ¶ 29)

**Coudersport/Seneca Highlands defendants' motion to dismiss**

Beverly Frith's testimony and the extensive documentary evidence produced by both sides effectively rebuts any contention that the Friths did not receive information about or were unaware of their right to appeal decisions made by school administrators affecting their son's academic progress.

"At no time during or after Aaron Frith's enrollment in the Coudersport Area School District, did Aaron Frith or his parents and natural guardians request a pre-hearing conference or due process hearing." (Harpst affidavit, ¶ 30 and DeRenzis affidavit, ¶ 19)

It cannot be convincingly argued that Beverly Frith did not receive notice of her right to challenge decisions concerning her son made by the district or school administrators. The record is replete with letters, notice forms and other documents indicating that at every critical juncture, she was reminded of her right to pursue the matter further if dissatisfied with the district's decision. When the NORA forms were submitted to her, they were accompanied by documents spelling out in great detail precisely what her options were, in terms of requesting a review hearing, how those options could be exercised, and how the hearing would be conducted, what her rights were, e.g. whether she was entitled to have counsel present, etc.

On the basis of the overwhelming evidence before us, we conclude that plaintiff cannot rely on the exemption applicable to cases in which the parents received no notice or inadequate notice of their due process rights to prevail on his claim for application of the exemption against Coudersport. See: *Max M. v. Illinois State Board of Education,* 629 F.Supp. 1504 (N.D.Ill.1986) (School district's violations of procedural rights of handicapped child and parents under Education for All Handicapped Children Act in failing to provide written notice including full explanation of all procedural safeguards was not sufficient to find that child had been denied free and appropriate public education in light of involvement of parents in developing child's special education programs, consistent with purposes of Act's notice provisions.) Compare: *Scituate School Committee v. Robert B.,* 620 F.Supp. 1224 (D.C.R.I.1985), *aff'd* 795 F.2d 77 (1st Cir.1986) (Notice to parents of handicapped child of meeting to develop individual education program was inadequate where it failed to specify who would be in attendance and did not mention that other individuals could attend; however, infirmities did not require invalidation of resulting plan since spirit of regulation was satisfied where mother had attended previous meeting and was aware of purpose of such meetings, persons who attended were the same individuals involved in a prior meet-

ing and parents were not prejudiced.); and *Mason v. Schenectady City School District,* 879 F.Supp. 215 (N.D.N.Y.1993) (Mother of developmentally disabled student was not required to exhaust administrative remedies before bringing action against school district under Individuals with Disabilities Education Act (IDEA), where school district persistently failed to inform mother of her due process rights over period of years.)

To the extent plaintiff argues that he is entitled to a waiver under the futility exception, we also disagree. Again, we find nothing in the record before us to indicate that resort to administrative remedies would, at this stage be futile. As we have stated before, plaintiff has the right to file administrative claims for compensatory education, even at this late date. We find nothing in the record to compel the conclusion that resort to such remedies would be futile. See generally: *N.S. v. Commonwealth of Pennsylvania,* 875 F.Supp. 273 (E.D.Pa.1995).

Finally, the exemption recognized by the Third Circuit in *Lester H.,* i.e. that only legal issues remain, is also unavailable to plaintiff. There are many disputed factual issues surrounding the question of whether plaintiff should have been classified as an exceptional student once the diagnosis of Tourette's Syndrome was made.

We find, in conclusion, no justification for waiving the exhaustion requirement with respect to the claims asserted against Coudersport and will dismiss all remaining claims asserted against the Coudersport defendants on that ground.

**Plaintiff's motion for reconsideration**

Plaintiff seeks reconsideration of those portions of the court's memorandum and order dated January 12, 1995 which address the damages recoverable under the claims asserted in Counts I and IV. Both counts will be dismissed pursuant to this memorandum, rendering plaintiff's motion moot.