

2000 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

1-14-2000

# Michael C. v Radnor Twp. Sch. Dist

Precedential or Non-Precedential:

Docket 99-1124

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_2000

Recommended Citation

"Michael C. v Radnor Twp. Sch. Dist" (2000). *2000 Decisions.* Paper 8.
http://digitalcommons.law.villanova.edu/thirdcircuit_2000/8

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova University School of Law Digital Repository. It has been accepted for inclusion in 2000 Decisions by an authorized administrator of Villanova University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

Filed January 14, 2000

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

No. 99-1124

MICHAEL C., A MINOR BY HIS PARENT
AND NEXT FRIEND, STEPHEN C.;
STEPHEN C., INDIVIDUALLY, AND ON
HIS OWN BEHALF

v.

THE RADNOR TOWNSHIP SCHOOL DISTRICT;
PENNSYLVANIA DEPARTMENT OF EDUCATION

Michael C.; Stephen C.,
          Appellants

On Appeal From the United States District Court
For the Eastern District of Pennsylvania
(D.C. Civ. No. 98-cv-04690)
District Judge: Honorable Charles R. Weiner

Argued: November 2, 1999

Before: NYGAARD, MCKEE and ROSENN, Circuit Judges.

(Filed: January 14, 2000)

          Dennis C. McAndrews, Esq. (Argued)
          Suite 130
          150 Strafford Avenue
          Wayne, PA 19087

           Counsel for Appellants
           Michael C. and Stephen C.

        Rosemary E. Mullaly, Esq. (Argued)
        Sweet, Stevens, Tucker & Katz, LLP
        116 East Court Street
        P.O. Box 150
        Doylestown, PA 18901

         Counsel for Appellee
         Radnor Township School District

        Calvin R. Koons, Esq. (Argued)
        D. Michael Fisher, Esq.
        John G. Knorr, III, Esq.
        Office of Attorney General
        Appellate Litigation Section
        15th Floor, Strawberry Square
        Harrisburg, PA 17120

         Counsel for Appellee
         Pennsylvania Department
         of Education

OPINION OF THE COURT

ROSENN, Circuit Judge.

This appeal has its genesis in social legislation enacted by Congress designed to encourage states to provide meaningful education to individuals with disabilities. The specific question before us is whether the Individuals with Disabilities Education Act ("IDEA"), 20 U.S.C.S 1400 et seq., requires a Pennsylvania school district to provide a student with disabilities who relocates from another state with an interim educational program identical to the program the student received in his or her prior state of residence. Michael C., a student with disabilities, attended a private school in Washington, D.C. under an Individualized Education Plan ("IEP") formulated by Washington educational authorities. Michael and his father moved from Washington to Radnor Township, Pennsylvania in the summer of 1997, and requested special educational treatment from the Radnor Township School District ("Radnor"). Radnor responded with specific educational proposals but Michael's father rejected them, and

2

unilaterally placed Michael in a private school. Michael remained in this school for 41 days, after which his family again moved, this time to New Jersey.

Michael's father later initiated administrative proceedings seeking reimbursement for tuition costs incurred while Michael attended the private school in Pennsylvania. After unsuccessfully pursuing his administrative remedies, Michael's father filed this action in the United States District Court for the Eastern District of Pennsylvania against Radnor and the Pennsylvania Department of Education ("PDE"), seeking tuition reimbursement and claiming violations of the IDEA, 20 U.S.C. S 1415(j), the Rehabilitation Act, 29 U.S.C. S 794, and the Civil Rights Act of 1871, 42 U.S.C. S 1983. He also claimed that Michael's and his family's right to travel interstate under the Fourteenth Amendment to the United States Constitution had been violated. On cross-motions for summary judgment, the district court entered summary judgment in favor of Radnor and PDE as to all claims. The court also granted PDE's separate motion for dismissal of theS 1983 claim as to it based on Eleventh Amendment immunity. This timely appeal followed.1 We will affirm.

I.

The facts of this case are undisputed. Michael, 17 years old at the time events relevant to this case occurred, is learning disabled and suffers from severe hemophilia. Prior to August 1997, Michael and his father lived in Washington D.C. Pursuant to the IDEA, Washington public educational authorities had developed an IEP2 for Michael.3 This IEP

_____

1. The district court had subject matter jurisdiction over this case pursuant to 20 U.S.C. S 1415(i) (formerly 20 U.S.C. S 1415(e)) and 28 U.S.C. SS 1331 and 1343. We have appellate jurisdiction pursuant to 28 U.S.C. S 1291.

2. The IEP is the "centerpiece" of the IDEA. See Honig v. Doe, 484 U.S. 305, 311 (1988). " `The IEP consists of a detailed written statement arrived at by a multi-disciplinary team summarizing the child's abilities, outlining the goals for the child's education and specifying the services the child will receive.' " Oberti v. Board of Educ. of Borough of Clementon
Sch. Dist., 995 F.2d 1204, 1213 n.16 (3d Cir. 1993) (quoting Polk v.

3

recommended placement at a "public/private separate school." (A.185a). Accordingly, Michael attended a small private school for learning disabled students called the LAB School. The LAB School served only students with disabilities, and therefore its students were segregated from their non-disabled peers. Michael attended the LAB School for three years.

When Michael and his father moved to Pennsylvania in 1997, the father contacted Radnor educational authorities to obtain appropriate placement for Michael. Radnor convened an "IEP meeting" to develop an interim program for Michael for the 1997-98 school year. At this time, Radnor had not yet completed its own evaluation of Michael's educational needs. By letter dated August 26, 1997, Radnor offered Michael two interim programming options pending completion of its own evaluation of Michael's needs. Both of these options placed Michael at Radnor High School ("Radnor High"), a large public high school with a total enrollment of approximately 800 students, where Radnor believed it could effectively implement the substance of Michael's Washington IEP. The first option, which Radnor characterizes as the"learning support" or "LS" option, involved enrolling Michael in mainstream English, science, social studies and elective classes, and in special education mathematics and written expression classes. This option also involved provision of support for homework and test preparation, and the development of study skills through a special education resource program. The second option, which Radnor characterizes as the "emotional support" or"ES" option,

_____

Central Susquehanna Intermediate Unit 16, 853 F.2d 171, 173 (3d Cir.1988), cert. denied, 488 U.S. 1030 (1989)). It "must include, among other things, a statement of the child's current level of educational performance, annual goals for the child, specific educational services to be provided, and the extent to which the child will participate in regular educational programs." Id. (citing 34 C.F.R. 300.346, subsequently recodified at 34 C.F.R. S 300.347 by 64 Fed. Reg. 12405, 12442 (Mar. 12, 1999)).

3. Under the IDEA, Washington, D.C. is considered a "State." 20 U.S.C. S 1401(27).

4

involved enrolling Michael in an "Emotional Support Program" for English, science, social studies, health and physical education classes, in "learning support" for mathematics, and in mainstream elective courses.

Michael's father rejected these options, and unilaterally decided to place Michael at the Hill Top School, a small private school for children with disabilities. In the fall of 1997, before Radnor had completed Michael's evaluation, Michael and his father again relocated, this time to New Jersey, for reasons related to the father's job. Michael had attended Hill Top for 41 days, during which time his father incurred tuition expenses in the amount of $4299.31. Because Michael left Pennsylvania before Radnor officials had completed their own evaluation of Michael's educational needs, Radnor never developed its own IEP for Michael.

In January 1998, after moving to New Jersey, Michael's father initiated a due process hearing in Pennsylvania as provided for by the IDEA, 20 U.S.C. S 1415(f). The purpose of this hearing was to determine whether the IDEA required Radnor to reimburse the father for the cost of Michael's Hill Top tuition. Both the local hearing officer and later the Pennsylvania Special Education Appeals Panel rejected the father's request. Both relied on a policy memorandum of the United States Department of Education's Office of Special Education Programs ("OSEP") stating that when a disabled student moves from one state to another, the new state of residence is not required to adopt and implement the most recent IEP developed for the student by the previous state of residence.

The plaintiffs then instituted the present action against Radnor and PDE. PDE moved to dismiss their S 1983 claim against it based on the Eleventh Amendment. In addition, the parties agreed that all claims could be decided on the administrative record without further evidence, and cross-moved for summary judgment. On February 5, 1999, the district court granted PDE's motion to dismiss the S 1983 claim as to it, and also granted the defendants' motion for summary judgment as to all claims and denied the plaintiffs' cross-motion, relying heavily on the OSEP policy memorandum.

II.

Although plaintiffs, Michael C. and his father, claimed numerous statutory violations and one constitutional violation in the district court, on appeal they seek relief on only two of these grounds. First, they contend that the IDEA's "pendency" or "stay-put" provision, 20 U.S.C. S 1415(j), required Radnor to implement Michael's Washington IEP. Second, plaintiffs argue that Radnor's refusal to implement Michael's Washington IEP violated his and his family's constitutional right to interstate travel. We exercise plenary review over the district court's order granting summary judgment in favor of the defendants. See W.B. v. Matula, 67 F.3d 484, 493 (3d Cir. 1995). The material facts being undisputed, we therefore address plaintiffs' arguments that they, and not the defendants, are entitled to judgment as a matter of law. See Fed. R. Civ. P. 56(c); Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986); Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-52 (1986).

    A. Whether the IDEA Required Radnor to Implement
    Michael's Washington IEP

In enacting the IDEA, Congress made known its strong preference for integrating students with disabilities into regular classrooms, and against segregating such students from their non-disabled peers unless absolutely necessary to provide them with an educational benefit. See 20 U.S.C. S 1412(a)(5)(A); Honig v. Doe, 484 U.S. 305, 311 (1988); Oberti v. Board of Educ. of Borough of Clementon Sch. Dist., 995 F.2d 1204, 1213-14 (3d Cir. 1993). Nevertheless, cases presenting the reverse situation occasionally arise, where the complaint is the school district's failure to segregate a child from his or her non-disabled peers by placing that child in a learning environment serving only disabled students. This is such a case.

The plaintiffs contend that the defendants' refusal to adopt Michael's Washington IEP and to implement that IEP by placing him in the segregated Hill Top school, as opposed to a more integrated learning program at Radnor High, violated the IDEA's "pendency" or "stay-put"

6

provision. This provision, found at 20 U.S.C. S 1415(j), states in pertinent part:

> . . . [D]uring the pendency of any proceedings conducted pursuant to this section, unless the State or local educational agency and the parents or guardian otherwise agree, the child shall remain in the then-current educational placement of such child, or, if applying for initial admission to a public school, shall, with the consent of the parents or guardian, be placed in the public school program until all such proceedings have been completed.[4]

Plaintiffs argue that when Michael moved to Radnor Township, the LAB School in Washington was Michael's "then-current educational placement," and Radnor educational authorities' process of evaluating his educational needs constituted pending proceedings. Accordingly, plaintiffs contend that Radnor was obligated during this time to implement Michael's Washington IEP, and that this required placing him at Hill Top, a private school, which they assert provided the educational program most similar to the one Michael received at the LAB School.

The district court agreed with the local hearing officer, the state appeals board, and the defendants that the IDEA is silent on how to apply the pendency provision when a student transfers from another state. It therefore accorded deference to the federal OSEP Policy Memorandum 96-5. That memorandum states in pertinent part:

> [E]ntitlement to a [free appropriate public education, or] FAPE, by its terms, encompasses an appropriate educational program that is individually-designed for each student in accordance with the requirements of Part B [of IDEA] and the educational standards of the State in which the student's parents reside. In

_____

4. In 1997, Congress amended the IDEA. These amendments, which for the most part became effective on June 4, 1997, substantially reorganized the statute. They also slightly modified the stay-put provision, which previously was found at 20 U.S.C.S 1415(e)(3)(A). However, the 1997 amendments do not appear to have altered this provision in any way relevant to this appeal.

addition, under 34 C.F.R. S 300.600, each State must exercise a general supervision over all programs in the State that provide educational services to disabled students, and must ensure that all such programs meet State education standards and Part B requirements.

When a student moves from a school district in State A to a school district in State B, the State B school district first must ascertain whether it will adopt the most recent evaluation and IEP developed for the student by the State A school district. Since the State A school district's evaluation and IEP were based in part on the educational standards and eligibility requirements of State A, the student's evaluation and IEP developed by the State A school district might not necessarily be consistent with the educational standards of State B. Therefore, the State B school district must determine, as an initial matter, whether it believes that the student has a disability and whether the most recent evaluation of the student conducted by the school district in State A and the State A school district's IEP meet the requirements of Part B and well as the educational standards of State B.

OSEP Policy Memorandum 96-5, reprinted in 24 Indiv. Disabil. Educ. L. Rptr. 320 (U.S. Dep't Educ. Dec. 6, 1995). The district court therefore held that the pendency provision did not require implementation of Michael's Washington IEP.

On appeal, plaintiffs make two arguments. First, they contend that the OSEP Policy Memorandum is not entitled to deference because the plain language of the pendency provision and federal judicial and administrative decisions interpreting this provision dictate a contrary result. Second, they argue that regardless of the interpretation given the IDEA's pendency provision, Pennsylvania regulations, which the IDEA incorporates into its scheme, contain a broader pendency requirement, and the Pennsylvania pendency regulation dictates a contrary result. Radnor and PDE dispute these arguments, and in addition contend that because no "proceedings" under section 1415 were pending

8

while Michael resided in Radnor Township, the stay-put provision is inapplicable. We address these arguments in order.

1. Application of the IDEA's Stay-Put Provision

In interpreting a congressional enactment, a court must first " `determine whether the language at issue has a plain and unambiguous meaning with regard to the particular dispute in the case.' " Deane v. Pocono Med. Ctr., 142 F.3d 138, 146 (3d Cir. 1998) (en banc) (quoting Robinson v. Shell Oil Co., 519 U.S. 337, 340 (1997)). "The plainness or ambiguity of statutory language is determined by reference to the language itself, the specific context in which that language is used, and the broader context of the statute as a whole." Robinson, 519 U.S. at 340. The IDEA is silent on how its pendency provision is to be applied to students who transfer interstate versus students who transfer intrastate, and the plain language of the pendency provision is at best ambiguous with respect to this issue. On its face, it is not clear that Congress intended the requirement that a student remain in his or her "then-current educational placement" to apply to students who relocate from one state to another. For example, a student's prior placement no longer seems "current" after he or she withdraws from that placement and moves away. Moreover, it is impossible for the student's new school district in Pennsylvania to keep the student in his or her previous school as required by the "stay put" provision where that school is in another state. Therefore, we must look beyond the isolated text of section 1415(j) for guidance on how to apply this provision in this case. See, e.g., United States v. Balascsak, 873 F.2d 673, 679 (3d Cir. 1989).

OSEP is the agency charged with principal responsibility for administering the IDEA. 20 U.S.C. S 1402(a). The portion of OSEP Policy Memorandum 96-5 relevant to this case is properly characterized as an interpretive rule because it imposes no substantive obligations, but rather clarifies that the IDEA's pendency provision does not apply to situations where a student moves from one state to

another. See Bailey v. Sullivan, 885 F.2d 52, 62 (3d Cir. 1989) (en banc).5

The district court deferred to OSEP Policy Memorandum 96-5, citing Chevron, U.S.A. Inc. v. Natural Resources Defense Council, Inc., 467 U.S. 837 (1984). This court has held that the level of deference to be accorded such interpretive rules depends upon their persuasiveness. "Admittedly, [they] do not rise to the level of a regulation and do not have the effect of law. A court is not required to give effect to an administrative interpretation. . .. Instead, the level of deference given to an interpretive bulletin is governed by the bulletin's persuasiveness." Brooks v. Village of Ridgefield Park, 185 F.3d 130, 135 (3d Cir. 1999) (citations omitted). See Elizabeth Blackwell Health Center for Women v. Knoll, 61 F.3d 170, 182 (3d Cir. 1995) (deferring to HHS directive interpreting Hyde Amendment restricting use of Medicaid funds to fund abortions, and holding that HHS interpretation preempted Pennsylvania law), cert. denied, 516 U.S. 1093 (1996); see also Honig, 484 U.S. at 325 n.8 (according deference to OSEP policy letter setting forth agency's interpretation of phrase "change in placement" in IDEA's predecessor statute).

The conclusion expressed in OSEP Policy Memorandum 96-5 that one state need not automatically accept and implement an IEP developed by another state does not appear to conflict with any previous or subsequent position taken by that agency. As we now discuss in greater detail, because this aspect of the policy memorandum is well-reasoned and persuasive in that it comports with the

_____

5. As it did before the district court, Radnor takes issue with portions of
the OSEP Policy Memorandum suggesting that where a disabled student with a functioning IEP in State A moves to State B, State B authorities should follow a procedure for interim assessment and program implementation prescribed therein. Although Radnor asserts that it satisfied OSEP's suggested procedures in this case, it contends that OSEP lacks authority under IDEA to impose these affirmative requirements on school districts. It is unnecessary for us to reach this issue, however (see Op. at 6 n.7; Radnor Br. at 18-19), and we express no opinion on these portions of OSEP's memorandum. Rather, our analysis is restricted to the memorandum's conclusion that one state need not adopt and implement an IEP developed by another state.

10

IDEA's statutory and regulatory scheme and with precedent interpreting that scheme, we are persuaded that the district court did not err in its thoughtful analysis and conclusion to defer to the memorandum.6

There are strong reasons for that deference and the result reached by the district court. The IDEA recognizes that education is traditionally a state function. Accordingly, it leaves the responsibility of providing a free appropriate public education, or "FAPE," to students with disabilities to state and local educational authorities. See 20 U.S.C. S 1400(c)(6) (1998); 20 U.S.C. S 1400(b)(8) (1996); 34 C.F.R. SS 300.13, 300.600 (1999). Provision of a FAPE requires that special education and related services must "meet the standards of the State educational agency," and must "include an appropriate preschool, elementary, or secondary school education in the State involved." 20 U.S.C. S 1401(8) (1998); 20 U.S.C. S 1401(18) (1996). Under current section 1412, States are eligible for federal financial assistance only when the state demonstrates that it "has in effect policies and procedures to ensure that it meets" the conditions imposed, including that it makes available a FAPE to children with disabilities residing in that state. 20 U.S.C. S 1412(a) (1998). A local educational authority is

_____

6. Citing to 20 U.S.C. S 1407(f), plaintiffs argue that the 1997 IDEA amendments make clear that OSEP's policy statements are not entitled to the force of law. Presumably, plaintiffs intended to cite to S 1406(f), which states that where the Secretary responds to an inquiry regarding a policy, question, or interpretation under Part B of the IDEA, that response "shall include an explanation that the written response--

(1) is provided as informal guidance and is not legally binding; and

(2) represents an interpretation by the Department of Education of the applicable statutory or regulatory requirements in the context of the specific facts presented."

Assuming that Policy Memorandum 96-5 is the type of response referred to by this provision, section 1406(f) merely imposes a requirement that the DOE response put readers on notice that it is not legally binding. This requirement, which was not effective when OSEP published Policy Memorandum 96-5, does not prevent us from considering DOE policy statements to be persuasive and therefore worthy of deference.

11

eligible to receive these federal funds only if it "has in effect policies, procedures, and programs that are consistent with the State policies and procedures established under section 1412." 20 U.S.C. S 1413 (1998).

Because Congress left primary responsibility for providing a FAPE and for implementing the IDEA to the states, we believe it unlikely that Congress intended the stay-put provision, which dates back to 1975 and the IDEA's predecessor statute, to impose a requirement on states that they must implement an IEP established in another state without considering how consistent that IEP is with the policies and mandates of the student's new residential state.

Precedent interpreting the IDEA's pendency requirement supports this interpretation. As the parties observe, the stay-put provision was intended to serve as a type of "automatic preliminary injunction" preventing local educational authorities from unilaterally changing a student's existing educational program. See Drinker v. Colonial School Dist., 78 F.3d 859, 864 (3d Cir. 1996). Where the student's existing IEP calls for public school placement with educational supports to compensate for the child's disability, the stay-put provision may require that local educational authorities not unilaterally attempt to alter the IEP by placing the child in segregated, non-regular education classes. See, e.g., Honig, 484 U.S. at 323-28; Oberti, 995 F.2d at 1220-24. Conversely, where the student's existing IEP requires placement in a private school, the stay-put provision may require that local authorities not unilaterally attempt to alter the IEP by placing the student in a public, regular education classes. See Drinker, 78 F.3d at 867; Jarczynski v. St. Mary's County Pub. Sch., 29 Indiv. Disabil. Educ. L. Rep. 49 (D. Md. Oct. 13, 1998).

However, where a parent unilaterally removes a child from an existing placement determined in accordance with state procedures, and puts the child in a different placement that was not assigned through proper state procedures, the protections of the stay-put provision are inoperative until the state or local educational authorities and the parents agree on a new placement. See Susquenita

12

Sch. Dist. v. Raelee S., 96 F.3d 78, 83 (3d Cir. 1996).7 Only once state authorities and parents have reached such agreement does a "then-current educational placement" come into existence. Id. In the instant case, it is Michael's father who unilaterally removed Michael from the LAB School when he moved the family to Radnor Township. Neither Washington educational authorities nor Pennsylvania authorities played any role in this decision. The plaintiffs now claim that upon moving to Pennsylvania, Radnor should have placed Michael at the Hill Top School rather than at Radnor High. However, his father never reached any agreement with Radnor or with other Pennsylvania educational authorities that Michael should be placed in a segregated, private school. Therefore, Michael had no "then-current educational placement" in the Commonwealth of Pennsylvania, and the stay-put provision provides no relief for him.

We hold that the IDEA's overall scheme and the precedent interpreting that scheme leads inexorably to the conclusion that when a student moves from State A to State B, any prior IEP in effect in State A need not be treated by State B as continuing automatically in effect. This interpretation of the inapplicability of the stay-put provision may, as plaintiffs claim, lead to the initial result that "disabled students like Michael with comprehensive and long-standing IEP's . . . can be forced upon an interstate move to somehow cope in regular education without supports while the district and the parent resolve any IEP dispute." (Appellant's Br. at 14 (emphasis in original)). But if parents believe that private school placement remains the only way to provide the student with the educational benefit required by the IDEA, or otherwise disagree with an IEP proposal, they can place the child in

_____

7. We note that this scenario is distinguishable from the situation in which a parent unilaterally removes a child previously determined to be disabled from one school district and moves the child to another school district in the same state. In the latter situation, the child's educational
placement has already been determined in accordance with state procedures and with the consent of the child's parents, and his or her IEP bears the imprimatur of that state. See Inquiry of Rieser, OSEP Policy Letter, July 17, 1986 (U.S. Dep't Educ. 1986).

a private school, initiate a due process hearing, and seek reimbursement from educational authorities later. 8 See Florence County Sch. Dist. Four v. Carter, 510 U.S. 7, 15 (1993); School Comm. of Town of Burlington, Mass. v. Department of Educ. of Commonwealth of Mass., 471 U.S. 359, 369-73 (1985). Of course, they act at their own financial risk, and will recover only if they are correct that local authorities have failed to provide the educational program to which their child is entitled under the IDEA. Burlington, 471 U.S. at 373-74. The plaintiffs' contention that these parents would have to keep paying private school tuition out of pocket for "years" is meritless, as federal and state regulations impose strict timing requirements on the completion of evaluations, the development and implementation of IEPs, and review of challenges to a local educational authority's proposal or refusal to initiate or change the identification, evaluation, or educational placement of a child or the provision of FAPE to a child. See 34 C.F.R. SS 300.504(a), 300.512; 22 Pa. CodeSS 14.25(m), 342.25(p) (timeline for completion of multidisciplinary evaluations); 22 Pa. Code. S 14.32(i) (timeline for preparation and implementation of IEPs); 22 Pa. Code SS 14.63, 14.64(o) (timelines for requesting and holding prehearing conference or due process hearing). We are mindful that this interpretation may bind the hands of parents who cannot afford to pay private school tuition out-of-pocket and await future reimbursement. This same result, however, can occur where parents of a student who transfers intrastate disagree with the new school district's placement of their child, and appears to be an unfortunate reality of the system Congress created.

Accordingly, we hold that the interpretation adopted by OSEP in Policy Memorandum 96-5 is a reasonable

_____

8. Because Pennsylvania never established an IEP for Michael, it is not certain that Radnor's interim educational plan for Michael was inappropriate. The administrative hearing officer concluded that the interim options proposed by Radnor would have closely approximated the placement Michael received at the LAB School. The district court found that this conclusion was supported by substantial evidence on the record as a whole (Op. at 8 n.10), and plaintiffs have not appealed this determination.

14

accommodation of the stay-put provision and the overriding
purposes and structure of the IDEA, and we are persuaded
that this interpretation deserves deference.9

### 2. Pennsylvania's Regulatory Pendency Requirement

Nevertheless, even though the IDEA's stay-put provision
does not provide a basis for relief, "[f]ederal law
incorporates state standards, and a school district may
violate the IDEA if it fails to satisfy the more stringent state

_____

9. We note that an additional reason for adopting OSEP's interpretation
of the stay-put provision, not asserted by the parties, may lie in the
limited congressional authority under which the provision was originally
enacted. The stay-put provision dates back to 1975, when it was enacted
as section 615(e)(3) of the IDEA's predecessor statute, the Education for
All Handicapped Children Act. See Pub. L. No. 94-142, 1975
U.S.C.C.A.N. (89 Stat.) 773, 789. Congressional authority for passage of
this statute derived from its spending power, U.S. Const. art. I, S 8, and
that act functioned by conditioning state and local educational
authorities' eligibility for federal funds upon their satisfaction of
certain
conditions favorable to education of disabled students. See Board of
Educ. of the Hendrick Hudson Central Sch. Dist. v. Rowley, 458 U.S. 176,
204 n.26 (1982). The Supreme Court has stated that "if Congress
intends to impose a condition on the grant of federal moneys, it must do
so unambiguously." Id. (quoting Pennhurst State School v. Halderman,
451 U.S. 1, 17 (1981)).

However, we note one wrinkle in this analysis. The 1997 amendments
to the IDEA altered the statute's "findings" provision to include language
invoking the Equal Protection Clause of the Fourteenth Amendment. See
18 U.S.C. S 1400(c)(6)-(10). This addition of the Fourteenth Amendment
as a constitutional basis for passage of the 1997 IDEA amendments may
undercut this spending power argument. Nevertheless, after the 1997
amendments, the stay-put provision remained substantially identical to
its previous text, was placed in "Part B" (subchapter II) of the amended
statute, which is entitled "Assistance for Education of All Children with
Disabilities," Pub L. No. 105-17, 1997 U.S.C.C.A.N. (111 Stat.) 37, 49,
and continued to appear in 20 U.S.C. S 1415, subpart (a) of which
explicitly states that the procedures established by that section are
conditions imposed upon "[a]ny State educational agency, State agency,
or local educational agency that receives assistance under this
subchapter."

Regardless, the parties have not raised or briefed this argument, and
we do not rely on it in deciding this appeal.

15

law requirements." Frith v. Galeton Area Sch. Dist., 900 F. Supp. 706, 712 n.9 (M.D. Pa. 1995) (citing Doe v. Board of Educ. of Tullahoma City Sch., 9 F.3d 455, 457 (6th Cir. 1993) (per curiam), cert. denied, 511 U.S. 1108 (1994)); see also Board of Educ. of East Windsor Regional Sch. Dist. v. Diamond, 808 F.2d 987, 992 (3d Cir. 1986). The plaintiffs argue that a Pennsylvania regulation imposes a more stringent pendency requirement than that imposed by IDEA itself or by DOE regulations. The regulation in question states:

> No change in the identification, evaluation, educational placement or IEP of an exceptional student or an eligible young child may be made during the pendency of an administrative or judicial proceeding unless agreed upon by the parties to the proceeding.

22 Pa. Code S 14.61(b).

The plaintiffs contend that this regulation's prohibition on changes in a child's "identification, evaluation, educational placement, or IEP" is broader than the federal prohibition on changes in a child's "then-current educational placement," and that this broader sweep includes evaluations and IEP's from other states. One federal district court has noted in dictum that the Pennsylvania regulation is "much more prohibitive than its federal counterpart" in that S 14.64(b) prohibits re-evaluation during the pendency of proceedings, whereas the federal stay-put provision only prohibits a change in educational placement. See Delaware County Intermediate Unit # 25 v. Martin & Melinda K., 831 F. Supp. 1206, 1223 n.25 (E.D. Pa. 1993). However, two other federal courts, including this court, have noted that the requirements of S 14.64(b) "track" the federal standard. See Drinker, 78 F.3d at 864 n.11; Matthew K. v. Parkland Sch. Dist., No. Civ. A. 97-6636, 1998 WL 84009, at *5 n.6 (E.D. Pa. Feb. 26, 1998).

The district court rejected Michael's contention, holding that "the Pennsylvania regulations are silent on accepting out of state IEP's." (Op. at 7 n.8). We believe the district court was right to do so for two reasons. First, Pennsylvania regulations contain a provision expressly requiring that:

16

> If an exceptional student moves from one school district in this Commonwealth to another, the new district shall implement the existing IEP to the extent possible or shall provide the services and programs specified in an interim IEP agreed to by the parents until a new IEP is developed and implemented in accordance with this [and other] sections[ ] . . . and until the completion of due process proceedings . . . .

22 Pa. Code. S 14.31(c). The existence of this specific regulatory provision is significant because a parallel provision dealing with students who move from another state to a school district in Pennsylvania, and who had previously been educated in accordance with an IEP developed in that other state, is conspicuously absent from these regulations. This absence evidences a lack of intent on the part of Pennsylvania regulators to address Michael's situation.

Second, the Pennsylvania appeals panel, the highest administrative authority of the Commonwealth to opine in this case, concluded that because the federal pendency provision did not apply, once plaintiffs rejected Radnor's interim IEP offer, "Michael was considered a regular education student." (A.119a). Presumably, had this state administrative panel construed Pennsylvania regulations to mandate implementation of the Washington IEP, it would have so held in its analysis.[10]

Accordingly, we hold that Pennsylvania regulations do not require a Pennsylvania school district such as Radnor to implement the IEP formulated in another state.

### 3. "Proceedings"

In addition, even if we did interpret the IDEA's stay-put provision to require a state to implement an IEP developed by another state, this provision is not applicable in this case because by its terms, it applies only to attempts to

_____

10. In addition, the local hearing officer directly rejected plaintiffs' argument, finding that Pennsylvania's regulations are merely "clarifications of how to implement the federal IDEA requirements within Pennsylvania." (A.127a-28a).

17

alter a student's current educational placement "during the pendency of any proceedings conducted pursuant to this section." 20 U.S.C. S 1415(j) (emphasis added). (See Radnor Br. at 9; PDE Br. at 14). Radnor and PDE contend that the earliest proceeding that can be conducted pursuant to section 1415 is a due process hearing (conducted pursuant to section 1415(f)), and that since Michael had already moved to New Jersey when he requested a due process hearing, no proceeding "conducted pursuant to" section 1415 was pending at the time he resided in Radnor Township.

The district court rejected this argument, holding that proceedings under section 1415 included "the opportunity of the parent or guardian to inspect relevant records with respect to the child's evaluation, and the notice requirement the school district must satisfy when making the initial placement decision," both of which had begun while Michael lived in Radnor Township. (Op. at 4 n.4). The district court characterized these as "proceedings set forth in S 1415(b)," and noted that both "are part of the process by which a school district changes a student's placement, but by definition occur before the start of a due process hearing."

In this respect, the district court was mistaken. The types of proceedings dealt with in section 1415(b), which include the conduct and development of evaluations, eligibility determinations, IEPs, and educational placement, arise under section 1414. Section 1415(b) merely sets forth "procedures" to be observed during these "proceedings." Therefore, no proceedings conducted pursuant to section 1415 were pending during the time Radnor offered to place Michael in Radnor High and his father instead placed him at Hill Top.11 See Verhoeven v. Brunswick Sch. Comm., ___ F.3d ___, No. 98-2348, 1999 WL 721698, at *5 (1st Cir. Sept. 21, 1999) (stay-put provision applies during pendency of "administrative and judicial proceedings challenging a placement decision"); Kari H. v. Franklin Special Sch. Dist.,

_____

11. We do not address whether the mediation procedures codified at section 1415(e) by the 1997 IDEA amendments qualify as "proceedings conducted pursuant to" section 1415 under the pendency requirement.

18

Nos. 96-5066 and 96-5178, 1997 WL 468326, at *6 (6th Cir. Aug. 12 1997) (per curiam) (only three types of proceedings arise under section 1415 -- due process hearings, state administrative review, and civil judicial review actions in state or federal court).12

Because we conclude that neither the stay-put provision nor Pennsylvania regulations required Radnor to implement Michael's Washington IEP, and that no proceedings were pending in Pennsylvania while Michael resided there, we therefore hold that plaintiffs' claim for reimbursement under the IDEA must fail.13

B. Michael's Constitutional Right to Travel

The plaintiffs also contend that Radnor's failure to implement Michael's Washington IEP violated their Fourteenth Amendment right to travel interstate by denying Michael benefits that would be afforded to a disabled student who transferred intrastate, from one Pennsylvania school district to another. We disagree.14

_____

12. See also Drinker, 78 F.3d at 863-64 (noting that stay-put provision applies during impartial due process hearing on parents' complaints regarding educational placement of handicapped children, and during state or federal judicial review of final administrative proceedings, without comment about provision's application to earlier proceedings involving local educational authorities); Mrs. C. v. Wheaton, 916 F.2d 69, 72 (2d Cir. 1990) (implying that pending "proceedings" means due process proceedings under section 1415); Smith v. Roher, Civ. A. No. 89-3258, 1991 WL 132545, at *1 (D.D.C. July 10, 1991) (stay-put provision applies once process of administrative review of placement decision is commenced and remains in effect through completion of civil action in district court).

13. Although it does not appear that plaintiffs have appealed their claim under the Rehabilitation Act, 29 U.S.C. S 794, we note that the district court correctly concluded that this claim is derivative of their IDEA claim
(Op. at 9), and therefore this claim too must fail.

14. In addition to granting summary judgment in favor of both defendants on this claim, the district court also dismissed plaintiffs' S 1983 claim as to PDE based on that defendant's Eleventh Amendment immunity. (Op. at 2 n.3). The plaintiffs have not argued that this decision was erroneous, and we therefore do not consider that ruling

19

The Court has described the constitutional right to travel as embracing at least three components: (1) the right of a citizen of one state to enter and leave another state; (2) the right to be treated as a welcome visitor rather than an unfriendly alien when temporarily present in the second state; and (3) for those travelers who elect to become permanent residents, the right to be treated like citizens of that state. See Saenz v. Roe, 119 S. Ct. 1518, 1525 (1999). The plaintiffs contend that the last of these components is violated by Radnor's refusal to honor Michael's Washington IEP. They base this assertion on the testimony of Radnor's Director of Special Education that, had Michael been a Pennsylvania resident who merely moved from another Pennsylvania school district to Radnor, an IEP calling for private placement would have been honored. (A.154a).

Adoption of the policy enunciated in OSEP Policy Memorandum 96-5, however, does not cause Michael to be treated differently from other Pennsylvania residents. Every student in Pennsylvania identified as disabled is entitled to an evaluation, an IEP, and if warranted, a special placement, in accordance with Pennsylvania procedures. Had Michael been a Pennsylvania resident transferring to Radnor from another Pennsylvania district, where he had already been identified as disabled and was being educated in accordance with an IEP developed there, he would have already submitted to these procedures. The District Director of Special Education's testimony that Radnor would have honored an IEP developed under such circumstances flows logically from this view and in no way affects plaintiffs' right to travel interstate.

Michael transferred from Washington, and had not yet undergone an evaluation in accordance with Pennsylvania procedures, as every other disabled student enrolled in Pennsylvania had. Therefore, in requiring that a new IEP be

_____

presented for our review. Accordingly, we discuss the plaintiffs' S 1983 claim as against Radnor only. Moreover, we do not address PDE's additional argument that Michael has not adequately alleged that any PDE official was involved in the decision not to honor his Washington, D.C. IEP.

20

developed, Radnor's treatment of Michael was not inconsistent with its treatment of Pennsylvania residents. Indeed, only by submitting to these procedures could Pennsylvania determine if Michael even had a right (under the IDEA) to a private placement. Pennsylvania decided that, at least on an interim basis, Michael had no such right, and his educational needs could instead be met in a structured public school placement. We need not pass on the merits of that decision. See supra note 8.

Arguably, requiring a disabled student who has undergone evaluation and IEP development in a different state to submit to this process a second time upon moving to a new state possibly may deter the student and his family from moving to the new state. However, an otherwise constitutional law that incidentally discourages migration is not necessarily rendered suspect or invalid merely because of such incidental effect. See Lawrence H. Tribe, American Constitutional Law S 15-14, at 1381 (2d ed. 1988).

Michael has a right, established by the IDEA and defined by state law, to a free, appropriate public education. Radnor has done nothing to alter or deny Michael that right. It has not imposed different standards on the type of education Michael may receive versus the type of education a disabled student who moves from one school district to another within Pennsylvania may receive. Thus, Michael cannot claim that Radnor's action in this case violated his right to travel under the Equal Protection Clause of the Fourteenth Amendment, and consequently, cannot claim a violation of 42 U.S.C. S 1983.

III.

For the foregoing reasons, the order of the district court granting summary judgment in favor of the defendants and denying summary judgment for the plaintiffs will be affirmed.

A True Copy:
Teste:

      Clerk of the United States Court of Appeals
      for the Third Circuit

21